Jack BLACKSMITH, Appellant,

v.

ALL–AMERICAN, INC., and Iowa Industrial Commissioner, Appellees.

No. 63557.

Supreme Court of Iowa.

March 19, 1980.

Rehearing Denied April 16, 1980.

William W. Garretson, Des Moines, for appellant.

Dorothy L. Kelley of Jones, Hoffmann & Davison, Des Moines, for appellee All-American, Inc.

Considered by REYNOLDSON, C. J., and HARRIS, McCORMICK, ALLBEE and LARSON, JJ.

McCORMICK, Justice.

The controlling question here is whether the industrial commissioner erred in denying additional workers' compensation to an employee who was transferred by his employer to a lower-paying job following a work-related phlebitis attack. We reverse and remand to the industrial commissioner because we find the employee established his right to compensation in an amount to be determined upon remand.

This case arises from a review-reopening proceeding. In a prior arbitration decision from which no appeal was taken, a deputy industrial commissioner had held petitioner Jack Blacksmith suffered from thrombophlebitis of his left leg caused by employ-ment activity while he was driving a truck for respondent All-American, Inc., between April 25, 1977, and April 30, 1977. The deputy based his holding on a medical report of Blacksmith's physician, Dr. Steven G. Kruse, in which the doctor said: "He gave a history of having spent long hours operating his truck before the onset of this, and I believe that the phlebitis arose because of the nature of his employment, being very likely triggered by compression of the venous return from the lower leg incident to the pressure on this area plus the trauma brought on by the motion of the truck." Dr. Kruse also said: "I anticipate no permanent disability from this although it is anticipated that he will be maintained on anticoagulants for the next few months." All-American was ordered to pay Blacksmith's medical bills and one and four-sevenths weeks of temporary disability compensation.

In reaching his decision, the deputy analyzed a report of Dr. Joseph M. Torruella, who had examined Blacksmith for All-American. The deputy noted that Dr. Torruella addressed a leg problem Blacksmith had in October 1976 and a conflict in the evidence concerning which leg was treated at that time rather than the causal connection between Blacksmith's employment activity in April 1977 and his phlebitis. The deputy said: "Accordingly, Dr. Torreulla's [sic] report was of little assistance in resolving the issue in this case."

Despite the optimistic prognosis of Dr. Kruse, All-American's safety director R. F. Preut notified Blacksmith by letter on December 2, 1977, that he was disqualified from driving a truck pursuant to federal regulations which state that a qualified driver must have "no established medical history or clinical diagnosis of vascular disease which interferes with his ability to control and operate a motor vehicle safely." *See* Federal Motor Carrier Safety Regulations, § 49 C.F.R. § 391.41(b) (1978). Preut said the company was relying on the report from Dr. Torruella, which he said he had just received. In his letter, Preut said: "I am deeply concerned with Dr. Torreulla's

[sic] closing paragraph: 'in view of the nature of phlebitis, the patient's relatively young age, and the nature of his occupation, it would not seem improbable that he would have additional clinical manifestations at some future time.'" Preut added: "The Dr.'s letter would indicate that the nature of your occupation—driving—is a factor in the circulatory problem in your leg."

As a result of his disqualification from driving, Blacksmith was transferred to a dock job where his average weekly income was substantially less than his prior earnings as a truck driver.

 Because of this transfer to a lower-paying position, Blacksmith filed his petition for review-reopening pursuant to sections 85.26(2) and 86.14(2), The Code 1979. Under section 86.14(2), as under 86.34, The Code 1977, the review-reopening proceeding provides a means for determining whether the condition of the employee warrants an increase in compensation previously awarded. One basis for increasing compensation is an increase in industrial disability proximately caused by the injury subsequent to the date of the original award. *Deaver v. Armstrong Rubber Co.*, 170 N.W.2d 455, 457 (Iowa 1969). *See also Meyers v. Holiday Inn of Cedar Falls*, 272 N.W.2d 24 (Iowa Ct.App. 1978) (same rule applies when increased disability results from failure of a diagnosed condition to improve to the extent anticipated). An increase in industrial disability may occur without a change in physical condition. A change in earning capacity subsequent to the original award which is proximately caused by the original injury also constitutes a change in condition under section 85.26(2) and 86.14(2). *See McSpadden v. Big Ben Coal Co.*, 288 N.W.2d 181, 192 (Iowa 1980); 3 A. Larson, The Law of Workmen's Compensation, § 81.31, at 15–502 (1976).

In the review-reopening proceeding Blacksmith showed the events which led to his transfer to the lower-paying job, relying mainly on the Preut letter in which All-American identified its reasons for the change. The record of the prior arbitration proceeding was made part of the review-reopening record. In resisting the petition, All-American relied on the letter report from Dr. Torruella which had been part of the evidence in the arbitration case and which Pruet had quoted from in his letter to Blacksmith.

The report of Dr. Torruella was as follows:

I examined Mr. Jack Blacksmith in my office on August 23, 1977. He stated that his legs were feeling normally and he was able to use them without impairment. He also indicated that he planned to return to work soon. He is presently on 7.5 mgs. of Coumadin daily for phlebitis of his left lower extremity.

I did discuss the Emergency Room Records of Lutheran Hospital with him. After I showed him the record of November 28 and November 29, 1976,[1] he did recollect that he had a problem with his left leg at that time. However, he thought he was undergoing treatment for tendonitis.

We discussed his hospitalization at Lutheran Hospital from March 30, 1977, to April 9, 1977. The discharge diagnosis was a phlebitis of the left leg, and he was placed on Coumadin.

When a minor deformity of his left foot was noted, he volunteered that he had broken his left foot at age 13 while engaged in sports. He was casted for a period of time, but he does not specifically recall any leg edema problems then. Physical examination of lower extremities was done. Each lower extremity was measured 10 inches above and 5 inches below the tibial tubercle. Right-sided measurements were respectively 24½ inches and 13 inches. The left-sided measurements were 24¼ inches and 17⅜ inches. No varicose veins were noted. There was no pitting edema on the left side. Homan's sign was negative. The dorsalis pedis and posterior tibial vessel pulsations were equally strong bilaterally.

---

1. The record shows the hospitalization actually occurred on October 28 and 29, 1976.

The foot was not pallorous with elevation. There was no hemosiderin deposits suggestive of chronic venous insufficiency.

Review of the Lutheran Hospital record, clearly indicates that Mr. Blacksmith has had problems with his left lower extremity intermittently since October 28, 1976. The Lutheran Emergency Room Record states, "Very positive Homan's sign. Pain when full extension of leg attempted. Suggestion of palpable cord in upper calf." There was no difference in the size of the calves or their temperature. These findings are mostly descriptive of a phlebitic process. The findings of the positive Homan's sign can occur with tendonitis, but it is much more common with a phlebitic process in the calf. The doctor's observation of a palpable cord in the upper calf may well represent a clotting process in the veins. However, the diagnosis was "Possible thrombophlebitis or tendonitis." He was placed on a regimen appropriate for thrombophlebitis and/or tendonitis.

He was seen the following day (November 29, 1976)[2] and there has been improvement in the interim. He could "extend leg today."

The Homan's sign was "slightly positive." He remained tender in the "upper ½ of the calf."

His admission to Lutheran Hospital is well documented and clearly describes a patient with thrombophlebitis of the left leg. The history does not make any mention of the left foot fracture at age 13, nor the two Lutheran Hospital emergency room visits in October 1976.

I would conclude that Mr. Jack Blacksmith had a problem with his left leg which pre-dated his 1977 Lutheran Hospital admission. This is verifiable from perusal of the Lutheran Hospital Emergency Room Records.

Furthermore, I think that it is most probable that he had a phlebitic process of his left leg in October 1976. The clinical notes of the record of 10–28–76 and 10–29–76 are more in keeping with a phlebitis than a tendonitis.

Furthermore, I think my findings of August 23, 1977, are descriptive of a post-phlebitic limb. He does have a measurable increase in the girth of his left calf exceeding the normal variation. He is presently on Coumadin, an oral anticoagulant, which is not infrequently prescribed for a post-phlebitic limb.

In view of the nature of the phlebitis, the patient's relatively young age, and the nature of his occupation, it would not seem improbable that he would have additional clinical manifestations at some future time.

Based on this report, All-American contended the job transfer was proximately caused by a preexisting vascular disease which had been merely "lighted-up" or "aggravated" by the 1977 work-related injury.

 Preut testified he asked All-American's supervisor of health services for information about the nature of thrombophlebitis. The supervisor, Darrel Johnson, a registered nurse, responded as follows in a letter dated December 16, 1977:

In looking over the reports of Jack Blacksmith, I can appreciate your concern for Jack's safety and the safety of anyone else who could be involved. Venous thrombosis or [phlebitis] denotes a frank inflammation of the vein wall of the leg or the foot. It is usually impossible to tell if the thrombus is the cause, or the result of the inflammation. Venous thrombosis is caused by stasis of blood, injury, bacteria, chemicals, or coagulation changes in the blood.

Thrombosis of a deep vein in the leg begins with clot formation in a muscle vein of the calf or foot. As it increases in diameter, it obstructs the larger veins. Part or all of the clot may break loose and become a pulmonary embolus. This would cause a sudden onset of dyspenea or pain, hemoptysis or asthma, in a patient with thrombophlebitis, cardiac failure or prolonged immobility. Physical

---

**2.** This date should be October 29, 1976.

signs that predominate include; weakness, prostration, sweating, nausea and vomiting. Fever and tachycardia are the rule. The dyspnea and cyanosis may be extreme. Massive infarction is often indicated by the onset of shock, jaundice, or right-sided heart failure. Sudden death is not uncommon.

If the patient is found to have venous thrombosis, the main goal is to avert the postphlebitic syndrome and prevent pulmonary embolism. The patient is placed on complete bed rest, the extremity . . elevated above heart level and warm moist packs applied to the involved area. This is followed with anticoagulation therapy until the problem is resolved. The potential of this condition to cause severe problems is very real. If the problem is reoccurent, the patient should be near medical treatment. I hope this information is of value to you.

Blacksmith offered evidence through his own testimony and that of the treating physician that the 1976 hospitalization was for tendonitis of the right leg rather than thrombophlebitis of the left leg as indicated by Dr. Torruella, but the deputy found in favor of Dr. Torruella's version of that incident. This finding was upheld by the commissioner. We are bound by the finding because it has substantial support in the evidence when the record is viewed as a whole. See § 17A.19(8)(f), The Code; *Farmers Elevator Co. v. Manning*, 286 N.W.2d 174, 176 (Iowa 1979).

However, the deputy made an additional and more crucial finding which was also upheld by the commissioner. He found that Blacksmith's job transfer was caused by a "preexisting condition had by the claimant for thrombophlebitis" rather than the work-related April 1977 thrombophlebitis. On that basis, the deputy held Blacksmith failed to meet his burden of proof and denied his claim for additional compensation. He said: "In short, this claim must fail because the claimant's lessening of remuneration from work was caused by the preexisting condition itself rather than any aggravation thereof."

In affirming the deputy, the industrial commissioner said Blacksmith's evidence in neither proceeding established that his "phlebitic condition was *caused* by his employment." (emphasis in original). He added: "Therefore, any loss of earning capacity the claimant may have by virtue of the existence of his phlebitic condition is not the result of a disability found to exist as a result of an injury arising out of and in the course of his employment."

■ Blacksmith contends the commissioner's decision was affected by an error of law as provided in section 17a.19(8)(e) because of his failure to give preclusive effect to the 1977 arbitration decision. He is correct that when an employer's liability for an injury has previously been established the employee may obtain increased compensation in a review-reopening proceeding by proving an increased disability which was proximately caused by that injury. See *DeShaw v. Energy Manufacturing Co.*, 192 N.W.2d 777, 780, (Iowa 1971); *Langford v. Kellar Excavating & Grading, Inc.*, 191 N.W.2d 667, 670 (Iowa 1971) ("This is all claimant need prove."). Thus the commissioner was bound by the arbitrator's determination of liability for the 1977 injury.

The commissioner held the 1977 decision was not preclusive in the review-reopening proceeding because the job transfer was caused by Blacksmith's "phlebitic condition" rather than the "temporary aggravation" or "lighting up" of that condition which the commissioner concluded was litigated in the arbitration case.

Because the 1977 disability was compensable in either event, it was not material in the arbitration proceeding whether it resulted from an initial injury or merely from an aggravation of a prior injury or condition. See *Nicks v. Davenport Produce Co.*, 254 Iowa 130, 135, 115 N.W.2d 812, 815 (1962) ("While the plaintiff would not be entitled to compensation for the results of a pre-existing injury or disease, the mere existence thereof, at the time of a subsequent injury is not a defense."). Moreover, contrary to the finding of the commissioner, the arbitration deputy did not in fact find

Blacksmith's disability resulted from aggravation of a preexisting condition. Relying on Blacksmith's testimony and the report of Dr. Kruse, which attributed the phlebitis to employment activity in April 1977, the deputy simply held that Blacksmith met his burden to prove the employment activity caused the health impairment on which his claim was based.

■ Thus the arbitration decision does not support the commissioner's conclusion that the award was based on work-related aggravation of preexisting phlebitis. However, it is also clear the arbitrator's decision did not depend on a finding that the phlebitis was an initial injury. The arbitration decision did not relieve Blacksmith of the burden in the review-reopening proceeding to show his increased disability was proximately caused by the 1977 injury. Furthermore, if the initial disability resulted from aggravation of a preexisting injury or disease, the award could not be increased unless the aggravation was a proximate cause of the additional disability. *Rose v. John Deere Ottumwa Works*, 247 Iowa 900, 908, 76 N.W.2d 756, 759 (1956).

If the commissioner had only Blacksmith's evidence to consider, he would have been obliged as a matter of law to hold in Blacksmith's favor. All-American admits Blacksmith was transferred because of his history of phlebitis, and the only phlebitis shown by Blacksmith and his doctors was the April 1977 phlebitis which the arbitrator's decision established was work-related. But the commissioner also had the Torruella report and based his holding against Blacksmith on that evidence.

Dr. Torruella's report is primarily devoted to refuting the contention of Blacksmith and his then treating physician that he had tendonitis of the right leg rather than phlebitis of the left leg when he was treated at Lutheran Hospital in October 1976. The report also confirms that the 1977 injury was phlebitis of the left leg. Dr. Torruella does not identify the nature of phlebitis or show its relationship to Blacksmith's age and occupation. He does not posit any relationship between the 1976 and 1977 incidents, nor does he say Blacksmith had a vascular disease either at the time of the trauma which concededly caused the 1977 injury or in August 1977 when the doctor's examination showed he had a "post-phlebitic limb." He does not attribute either injury to a preexisting condition. Under this record each incident may have been wholly independent of the other in its origin and effects. The most that can be said is that Dr. Torruella relied on both incidents when he predicted additional clinical manifestations "would not seem improbable."

We must decide whether this evidence is a sufficient basis for the commissioner's holding that Blacksmith failed to meet his burden to prove a causal relationship between his 1977 injury and his disqualification from truck driving.

■ Health supervisor Johnson's letter identifies phlebitis as inflammation of a vein wall and thrombus as a possible cause or result of the inflammation. He said the problem can be caused naturally or by trauma. *See* 1C R. Gray, Attorneys' Textbook of Medicine ¶ 21.22, at 21–19 (1979) (mentioning long trip on train or bus as cause); 5A Lawyers' Medical Cyclopedia § 34.28a(C) (C. Frankel ed. 1972) (mentioning long auto ride as cause); Wilkins, *Phlebothrombosis and Thrombophlebitis, in* A Textbook of Medicine 1395 (9th ed. R. Cecil & R. Loeb 1955). *See also Weber v. Carhart Photo, Inc.*, 46 A.D.2d 964, 362 N.Y.S.2d 62 (1974) (holding phlebitis caused by driving auto for extended periods in course of employment); *Hall's Bakery v. Kendrick*, 176 Va. 346, 11 S.E.2d 582 (1940) (holding phlebitis caused by squatting while searching for business envelopes). Traumatic phlebitis is an "injury" for workers' compensation purposes. *See Almquist v. Shenandoah Nurseries, Inc.*, 218 Iowa 724, 732, 254 N.W. 35, 39 (1934). The record here does not show the cause of the 1976 phlebitis, but the arbitrator's decision establishes the 1977 phlebitis was caused by trauma.

■ Although the Torruella report supports a reasonable inference that Blacksmith is susceptible to phlebitis from truck-

driving in the future, it does not support a reasonable inference that his 1977 injury resulted from aggravation or lighting up of a preexisting health impairment. The fact that a similar disability occurred previously does not alone constitute substantial evidence that either incident resulted from a preexisting injury or disease.

■ To be a preexisting condition under our cases, an actual health impairment must exist, even if it is dormant. *See, e. g., Sondag v. Ferris Hardware*, 220 N.W.2d 903 (Iowa 1974) (atherosclerosis); *DeShaw v. Energy Manufacturing Company* (spondylolisthesis); *Merchant v. SMB Stage Lines*, 172 N.W.2d 804 (Iowa 1969) (atherosclerosis); *Ziegler v. United States Gypsum Co.*, 252 Iowa 613, 106 N.W.2d 591 (1960) (prior back injury); *Rose v. John Deere Ottumwa Works* (osteoarthritis). *See generally* 1 A. Larson, The Law of Workmen's Compensation § 12.20 (1978). No evidence of such a preexisting impairment was adduced in this case.

Furthermore, so far as this record shows, the Torruella prediction may be merely a projection based on statistical probabilities. If so, the 1977 injury would be an essential factor in the projection.

We hold that the commissioner erred in attributing Blacksmith's job transfer to a preexisting condition in reliance on the Torruella report. Moreover, we believe it is undeniable under this record that the 1977 phlebitis was a proximate cause of the transfer.

■ When evidence is undisputed and not subject to different inferences, an issue is to be decided as one of law. *See Hawk v. Jim Hawk Chevrolet-Buick, Inc.*, 282 N.W.2d 84, 87 (Iowa 1979). A cause is proximate if it is a substantial factor in bringing about the result. *See Holmes v. Bruce Motor Freight, Inc.*, 215 N.W.2d 296, 297 (Iowa 1974). It only needs to be one cause; it does not have to be the only cause. *See Langford v. Kellar Excavating & Grading, Inc.*, 191 N.W.2d at 670.

No reasonable person could deny the 1977 injury was a motivating reason for Blacksmith's job transfer. All-American admits it disqualified him from driving a truck in the belief driving a truck could cause him to get phlebitis. The Torruella report shows the 1977 injury is one basis for All-American's apprehension of that danger. This is clear from Preut's letter when he said: "The Dr.'s letter would indicate that the nature of your occupation—driving—is a factor in the circulatory problem in your leg." Blacksmith was transferred because of this perceived risk of subsequent health impairment, and the perception was indisputably based in part on the 1977 experience.

This case is analogous to *Langford v. Kellar Excavating & Grading, Inc.*, in which this court held the conclusion was "inescapable as a matter of law" that the employee's increased disability was directly traceable to his original compensable injury. 191 N.W.2d at 670.

■ We hold, as a matter of law, that Blacksmith sustained his burden of proof to show that the 1977 injury was a proximate cause of his reduced earning capacity.

Therefore we reverse the district court and remand the case to the commissioner for a determination of the extent of Blacksmith's disability under the record made in the review-reopening proceeding. *See Langford*, 191 N.W.2d at 670–71. In doing so, we note that Blacksmith alleges an industrial disability, as the concept is explained in *McSpadden v. Big Ben Coal Co.*, 288 N.W.2d 181, 192 (Iowa 1980). In accordance with the principles delineated in *McSpadden*, we hold that Blacksmith did incur an increased industrial disability and is not barred from recovery by failure to prove an increased functional disability of his leg. *See also Mich Coal Co. v. Second Injury Fund*, 274 N.W.2d 300, 302 (Iowa 1979). This is the case of an employee who has no apparent functional impairment and who wants to work at the job he had before but is precluded from doing so because his employer believes the past injury disqualifies him, resulting in a palpable reduction in earning capacity. The extent of Blacksmith's industrial disability is an issue of fact for the commissioner to resolve.

REVERSED AND REMANDED TO THE INDUSTRIAL COMMISSIONER.