John A. GALLARDO, Appellant,

v.

FIRESTONE TIRE & RUBBER COMPANY and Cigna Insurance Companies, Appellees.

No. 90–1658.

Supreme Court of Iowa.

March 18, 1992.

David D. Drake of Lawyer, Lawyer, Dutton & Drake, West Des Moines, for appellant.

Frank T. Harrison of Hopkins & Huebner, P.C., Des Moines, for appellees.

Considered by HARRIS, P.J., and CARTER, LAVORATO, NEUMAN, and SNELL, JJ.

NEUMAN, Justice.

This appeal by an employee challenges a judicial review decision that affirmed the industrial commissioner's denial of additional workers' compensation benefits following a second review-reopening hearing under Iowa Code section 86.14(2) (1989). We transferred the case to the court of appeals, which affirmed on a two-to-one vote. Because we are convinced the commissioner's decision is unsupported by the record made before the agency, we vacate the court of appeals decision, reverse the judgment of the district court, and remand to the agency for further proceedings.

I. For over thirty years appellant John Gallardo worked in the factory owned by appellee Firestone Tire & Rubber Company in Des Moines, Iowa. He held a variety of positions from maintenance worker to tire builder. While building tires in April 1980, Gallardo suffered a severe back injury. He began receiving weekly workers' compensation benefits pursuant to a negotiated settlement with the company.

In 1984 Gallardo filed his first review-reopening petition. Since his injury four years before, he had undergone two back surgeries to repair damage sustained in the original accident. Although he returned to the plant following recovery from each operation, weight and motion restrictions limited the work he was comfortably able to do. Thus he sought additional compensation for an industrial disability that fully reflected his decreased earning capacity.

At the time of the first hearing Gallardo happened to be on vacation. He testified that just prior to this leave his supervisor had advised him to sit idle at the job site because there was no work within his department that satisfied his light duty requirements. Gallardo's physician also testified regarding Gallardo's expressed concern that there were no jobs within the plant that he could painlessly and safely perform. Gallardo's impression was contradicted by a company spokesman, however, who testified that the company was willing to accommodate Gallardo's medical restrictions with suitable employment. Without disputing Gallardo's veracity, the official expressed surprise at Gallardo's statement that he spent his days drinking coffee. But when asked to cite a specific position Gallardo would qualify for under the circumstances, he could not name one.

The deputy industrial commissioner concluded that Gallardo was suffering a fifty percent industrial disability. On adminis-

trative appeal by the company, the commissioner reduced this figure to forty percent based on the company's professed willingness to accommodate Gallardo's medical restrictions with continued employment. Gallardo's benefits were adjusted accordingly.

Immediately following final ruling in the first proceeding, Gallardo filed a second review-reopening petition. He alleged further deterioration in his physical condition and resultant reduction in his earning capacity. The evidence produced two years later in his second proceeding forms the basis for this appeal.

The record reveals that shortly after the first hearing Gallardo returned to the plant and was assigned to the task of cleaning machinery. After two or three weeks on this job his legs collapsed while he was climbing a ladder. On his doctor's advice he did not return to the plant. The company then authorized fifty-two weeks of accident and disability payments. Thereafter Gallardo applied for and began receiving a medical disability retirement pension. Testimony from a company official confirmed that Firestone would authorize disability retirement only upon satisfactory proof that an employee's medical condition prevented him or her from working in the plant.

In his ruling on Gallardo's second petition, the industrial commissioner rejected Gallardo's claim that his worsening condition and disability retirement warranted an adjustment to the benefits established by the first review-reopening proceeding. The commissioner found insufficient evidence in the record to support a finding that Gallardo's physical condition had changed. Moreover, the commissioner ruled that although Gallardo's earnings had changed by virtue of his retirement, his earning *capacity* had not. Thus the commissioner ruled there was no basis to adjust the prior award. It is from this ruling, and the district court's and court of appeals' affirmance of it, that Gallardo now seeks further review.

■ II. Our decision is guided by well-settled rules. On appeal from judicial review of agency action, our review is limit-

ed to correction of errors at law. *Jackson County Pub. Hosp. v. PERB*, 280 N.W.2d 426, 429 (Iowa 1979). The industrial commissioner's factual findings are binding on us if the evidence is in dispute or if reasonable minds could draw different inferences from it. *Gosek v. Garmer & Stiles Co.*, 158 N.W.2d 731, 732 (Iowa 1968). The test is whether the commissioner's decision is supported by substantial evidence. *Id.* at 732. Evidence is substantial if a reasonable person would find it adequate to reach a conclusion. *Armstrong v. State of Iowa Bldgs. & Grounds*, 382 N.W.2d 161, 166 (Iowa 1986).

■ Iowa Code section 86.14(2) authorizes the industrial commissioner to reopen an award or settlement of workers' compensation benefits to inquire "whether or not the condition of the employee warrants an end to, diminishment of, or increase of compensation so awarded or agreed upon." This is commonly known as a "review-reopening" proceeding. *See also* Iowa Code § 85.26(2) (providing three-year statute of limitation for review-reopening petitions). The claimant carries the burden of establishing by a preponderance of evidence that, subsequent to the date of the award under review, he or she has suffered an impairment or lessening of earning capacity proximately caused by the original injury. *Blacksmith v. All–American, Inc.*, 290 N.W.2d 348, 350 (Iowa 1980); *Deaver v. Armstrong Rubber Co.*, 170 N.W.2d 455, 457 (Iowa 1969).

■ The necessary showing in a review-reopening proceeding may be made without proof of change in physical condition. *Blacksmith*, 290 N.W.2d at 350; 3 A. Larson, *The Law of Workmen's Compensation* § 81.31(e), at 15–1030 (1989). That is because industrial disability is the product of many factors, only one of which is functional disability stemming from the physical injury. *McSpadden v. Big Ben Coal Co.*, 288 N.W.2d 181, 192 (Iowa 1980). Other factors include age, education, experience, and "inability, because of the injury, to engage in employment for which [the employee] is fitted." *Id.* (quoting *Olson v.*

*Goodyear Serv. Stores,* 255 Iowa 1112, 1121, 125 N.W.2d 251, 257 (1963)).

III. There is no dispute over the fact that Gallardo's earnings diminished between the first review-reopening hearing in November 1985 and the second hearing held April 4, 1988. The question is whether substantial evidence in the record supports the agency's conclusion that Gallardo's earning *capacity* remained unchanged in the interim.

The industrial commissioner acknowledged that Gallardo's early retirement reduced his earnings and would thereby qualify as a nonphysical change of condition meriting review. But the commissioner rejected Gallardo's claim that his diminished earning capacity, and ultimate retirement, were causally related to his work injury. His ruling rested on two crucial findings: (1) that there was no change in Firestone's effort to provide substitute employment, and (2) Gallardo offered no "objective" proof to corroborate his "subjective" decision to retire. Based on our review of the record, we are convinced these findings are not supported by the evidence presented.

The commissioner's ruling in the first review-reopening proceeding made it plain that, but for evidence of Firestone's willingness to continue Gallardo's employment, he would be entitled to an industrial disability rating of fifty percent. Because of Firestone's professed willingness to accommodate him, the disability rating was adjusted downward ten percent. Later events reveal, however, that the accommodation was not forthcoming. Within three weeks following Gallardo's return to the plant after the first hearing, he found himself physically unable to complete his work assignment. Consistent with his suspicion that there was no suitable work in the plant for him, Firestone did not discipline or discharge Gallardo for refusing to return to his assigned task. Instead the company authorized fifty-two weeks of accident and disability payments. We think this is entirely inconsistent with the commissioner's conclusion that Gallardo "unilaterally concluded that his physical impair-

ment made it dangerous for him to work near equipment."

This same inconsistency in the commissioner's reasoning applies to Gallardo's disability retirement. The commissioner characterized Gallardo's decision as a "voluntary act [which] may or may not have been based on his injury." The record, however, reveals the following colloquy with the company official charged with implementing Firestone's decisions relative to medical retirement:

Q. As far as who makes the decision as to whether or not the medical retirement is put into effect, that's who? The company? A. The company, yes, has a board. They have a company physician. They're in Akron.

Q. Who qualifies for medical retirement? A. Normally people who would be entitled.

Q. How do you become entitled? A. There again, we're back to the board. They make that determination based on the medical evidence before them.

Q. Does the medical evidence before them have to be such that he could not work in the plant? A. It varies from case to case, but by and large, it would be perceived at that time that he probably would not be able to work in the plant.

Q. *If it were shown to the board's satisfaction that he was able to work in the plant, he wouldn't be awarded those benefits?* A. He'd be denied.

(Emphasis added.)

We think it clear from this record that Gallardo's decision to retire early was not unilateral. According to company policy, it could not be. Given the company's admission in this regard, there is no basis for the commissioner's contrary finding that the company was still willing to find Gallardo suitable employment in the plant. The record belies the suggestion that only his earnings had diminished; his *capacity* to earn had changed markedly as well.

The commissioner was understandably skeptical that there could have been a marked change in Gallardo's physical condition between the hearing on the first re-

view-reopening petition and the second petition filed less than two months later. But the fact remains that Firestone tacitly, if not expressly, acknowledged Gallardo's inability to work when it placed him on accident and disability leave and, thereafter, approved his medical retirement status. The company's professed willingness to accommodate Gallardo's disability simply did not materialize.

Because the company reversed itself concerning employment opportunities for Gallardo, the commissioner's finding of "no change" since the prior hearing is without substantial support. We are convinced that the commissioner should have adjusted Gallardo's award upward by ten percent to reflect the full impact of the industrial disability determined at the first hearing. Thus we reverse and remand to the agency for recomputation of Gallardo's benefits consistent with this opinion.

DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED AND REMANDED WITH INSTRUCTIONS.