# IN THE COURT OF APPEALS OF IOWA

No. 13-1653
Filed July 16, 2014

**ARCHITECTURAL WALL SYSTEMS and
ZURICH NORTH AMERICA,**
    Petitioners-Appellants,

**vs.**

**DONALD TOWERS,**
    Respondent-Appellee.
_____

Appeal from the Iowa District Court for Polk County, Karen A. Romano,

Judge.


Architectural Wall Systems and Zurich North America appeal the district

court ruling affirming the decision of the workers' compensation commissioner.

**AFFIRMED.**


Charles A. Blades and Kent Smith of Scheldrup, Blades, Schrock, &

Smith, P.C., Cedar Rapids, for appellants.

Fredd J. Haas of Fredd J. Haas Law Offices, P.C., Des Moines, for

appellee.


Considered by Vaitheswaran, P.J., and Tabor and Bower, JJ.

**BOWER, J.**

Architectural Wall Systems and Zurich North America appeal the district court ruling affirming the decision of the Iowa Workers' Compensation Commissioner. The commissioner determined Donald Towers's deep vein thrombosis constituted an injury to the body as a whole and awarded him a sixty percent industrial disability. We find substantial evidence supports the commissioner's determination the deep vein thrombosis was a spill-over injury affecting the body as a whole, and Towers sustained a sixty percent industrial disability. Accordingly, we affirm.

**I.    Background Facts and Proceedings**

In May 2009, Donald Towers joined the Glaziers, Architectural Metal, and Glass Workers Union to be trained as a glazier. The training would take approximately three years to complete and would begin the following September. Before he could begin the training, however, Towers was injured when he twisted and fractured his right ankle while working for Architectural Wall Systems.[1] Towers classifies his position with AWS as an industrial worker/glazier, while AWS claims Towers was an unskilled industrial worker who was not working as a glazier at the time of the accident. The compensability of Towers's injury and treatment is uncontested.

Towers initially saw Dr. Jon Gehrke, who performed surgery to repair the broken ankle. The surgery was successful, and Towers continued to receive physical therapy on the ankle for some time. Towers continued to suffer from

---

[1] Architectural Wall Systems and Zurich North America, the appellants in this case, will be collectively referred to as "AWS."

swelling after prolonged standing, despite use of a compression stocking. Towers also complained of foot pain due to the hardware installed during the surgery. The foot pain was addressed with a shoe insert. Towers returned to an office job for AWS after the surgery, but later was let go for reasons unrelated to his injury. Dr. Gehrke imposed permanent restrictions due to the ankle injury and assigned impairment ratings.

Six weeks post surgery, Towers began experiencing pain and swelling in his right leg. Dr. Dennis Fry diagnosed Towers with deep vein thrombosis (DVT) and referred Towers to Dr. Yeager for surgery. Dr. Yeager performed surgery to remove a blood clot and inserted a filter to prevent clots from moving to Towers's heart or lungs. Towers was later hospitalized for recurrent DVT and eventually discharged and directed to take anticoagulants twice daily. Towers continued to see Dr. Yeager after discharge from the hospital. Dr. Yeager recommended long-term use of a support stocking and intermittent leg elevation after three to five hours of standing, sitting, or after the onset of pressure or pain in the leg. In July 2010, Towers underwent venous duplex testing for an unrelated diagnosis of cellulitis. The testing revealed no evidence of active DVT in the right leg and only old DVT in two veins.

Dr. Yeager and Dr. Gehrke each released Towers from treatment in October 2010. Dr. Gehrke placed Towers at maximum medical improvement (MMI). Dr. Troll evaluated Towers to determine an impairment rating for his vascular system, which was set at five percent to the body as a whole. In response to a letter from counsel, Dr. Troll later clarified the rating was five

percent of the lower extremity, not to the body as a whole. He also concluded the DVT was limited to the lower extremity.

On May 25, 2011, Towers underwent an independent medical evaluation (IME) by Dr. Charles Mooney, who found no permanent impairment from the DTV, but a ten percent permanent impairment due to the ankle injury. Dr. Mooney also confirmed a fifty-pound lifting restriction, previously imposed due to the filter, but noted the restriction could be lifted if Towers elected to have the filter removed. Towers has not done so.

Another IME was conducted by Dr. John Kuhnlein.[2] Dr. Kuhnlein related the DVT to the ankle injury and agreed with the five percent body as a whole impairment rating. AWS requested additional information from Dr. Kuhnlein, who responded, stating DVT would normally be considered a systemic condition, and accordingly would not be restricted to an extremity; however, in this case the DVT would be restricted to the lower extremity because it was the result of localized trauma. Dr. Kuhnlein concluded the DVT was a "localized phenomenon rather than a systemic or body as a whole phenomenon."

A deputy workers' compensation commissioner found the DVT was limited to the lower extremity and therefore was not compensable as an industrial disability. On appeal to the commissioner, the deputy's decision was reversed. The commissioner found the DVT was not limited to the lower extremity, but constituted an industrial disability. Relying on established agency precedent, the commissioner found DVT is a "spill-over" systemic disease that inherently affects

---

[2] Dr. Kuhnlein's opinions are based upon a review of the medical documents as Towers did not appear for his appointment.

the body as a whole. He also determined the medical opinions limiting DVT to the lower extremities were not persuasive because the term "lower extremity" used in the opinions was not synonymous with "leg" as used in the Iowa Code. The commissioner found Towers's injuries resulted in a sixty percent industrial disability. On appeal, the district court affirmed the commissioner's decision.

## II. Standard of Review

Our review of agency action is governed by Iowa Code section 17A.19(10) (2013). The level and type of review varies depending upon the type of error asserted. *Lakeside Casino v. Blue*, 743 N.W.2d 169, 173 (Iowa 2007).

When the claim of error is with findings of fact, we examine whether substantial evidence supports those findings. *Meyer v. IBP, Inc.*, 710 N.W.2d 213, 218 (Iowa 2006). "Substantial evidence means the quantity and quality of evidence that would be deemed sufficient by a neutral, detached, and reasonable person, to establish the fact at issue when the consequences resulting from the establishment of that fact are understood to be serious and of great importance." Iowa Code § 17A.19(f)(1). When the claimed error is application of law to the facts, we affirm unless the application was irrational, illogical, or wholly unjustifiable. *Burton v. Hilltop Care Center*, 813 N.W.2d 250, 256 (Iowa 2012).

When the claimed error is with the commissioner's interpretation of the relevant statutes, when interpretation has not been clearly vested to the discretion of the agency, we grant no deference and may substitute our own judgment. *Lakeside Casino*, 743 N.W.2d at 173.

III.     Discussion

AWS raises two issues on appeal.  First, the commissioner erred in finding Towers's DVT is an injury to the body as a whole.  Second, the commissioner erred in finding a sixty percent industrial disability.

A.     Injury

In a lengthy legal analysis, the commissioner determined Towers's DVT constituted an injury to the body as a whole, rendering it compensable as an industrial disability.  AWS claims the commissioner erred in several ways.  First, the medical evidence establishes the DVT was confined exclusively to Towers's right leg, and secondly, the commissioner's reliance on the filter as evidence of a permanent condition outside the leg is improper because the filter is preventative and can be removed at any time.  Next, AWS argues the commissioner's decision-making process was flawed because of reliance upon medical evidence in a separate case to conclude DVT is always a systemic issue affecting the body as a whole.  Finally, AWS claims the commissioner improperly construed the law to conclude DVT is always an injury to the body as a whole.

Whether Towers's DVT is limited to his right leg, or affects the body as a whole, is critical in determining compensation for his injury.  Iowa Code section 85.34(2)(a)–(t) establishes a compensation schedule for certain permanent partial disabilities, including injuries to the leg.  These injuries are compensated by reference to the employee's average spendable weekly earnings.  Iowa Code §85.34(2).  If, however, the injury is not confined to one of the scheduled areas,

the injury is compensated industrially by consideration of the employee's lost earning capacity. *Id.* § 85.34(2)(u).

The medical testimony in this case reaches a uniform conclusion. Each doctor, whether treating or providing an IME, concluded the DVT was confined to Towers's right lower extremity. The clots did not travel elsewhere in the body, and the specific cause of the DVT—trauma to the ankle—restricts the condition to the lower extremity. There is no medical testimony establishing the DVT as a permanent impairment to the body as a whole, and the one doctor who set a whole body impairment rating later amended his conclusion and restricted the injury to the lower extremity.[3] AWS is correct that all the medical evidence supports their position the injury was confined to the lower extremity. That, however, does not resolve the case.

The commissioner is empowered to determine the weight each medical opinion should be assigned, taking into account the completeness of the opinions and the circumstances under which the opinion was given. *Dunlavey v. Economy Fire & Cas. Co.*, 526 N.W.2d 845, 853 (Iowa 1995). "This does not mean the fact finder may arbitrarily or totally reject the offered testimony, simply that he has the duty to weigh it and determine its credibility." *Langford v. Kellar Excavating & Grading, Inc.*, 191 N.W.2d 667, 669 (Iowa 1971). We do not agree with AWS that the commissioner totally rejected the medical opinions offered in this case.

---

[3] The commissioner relies upon Dr. Troll's five percent body-as-a-whole impairment rating in assessing the degree of industrial disability. There is no five percent body-as-a-whole impairment rating, as Dr. Troll later amended his opinion finding a five percent impairment to the lower extremity only.

The medical opinions use the term "lower extremity" to describe the site of the DVT. Unfortunately, our legislature did not use the same medical terminology in crafting section 85.34(2), which uses the narrower term "leg" to describe the scheduled injury. As pointed out by the commissioner, an injury could be to the hips or pelvis, both of which are included in the broader definition of "lower extremities" according to the AMA Guides Fifth Edition, employed by the agency in this case, but which would not be a part of the "leg" for section 85.34(2) purposes. Of particular importance here is the permanent placement of the filter outside of Towers's leg, the presence of which requires the placement of permanent restrictions that impact Towers's earning capacity. Dr. Yeager did not recommend removal of the filter because it remained well aligned in a follow up x-ray. Towers testified the filter has not been removed because the risk of removal is greater than the risk of leaving the filter in place.[4] Placing the medical opinions in relation to the relevant statutory language, we find the commissioner was entitled to find the ongoing placement of the filter is evidence of an ongoing disability outside of the leg, yet within the lower extremity as used in the medical opinions.

We also find Towers's DVT represents a spill-over injury, compensable as an injury to the body as a whole. When there is an injury to a scheduled member and also to parts of the body that are not scheduled members, the whole injury is compensated on the basis of the unscheduled injury. *Mortimer v. Fruehauf Corp.*, 502 N.W.2d 12, 17 (Iowa 1993). No one questions Towers suffered a

---

[4] Towers also testified there is a recall on the filter, yet removal remains the more dangerous option.

scheduled member injury. We agree with the commissioner's factual determination that the injury went beyond the scheduled member—the leg—and into other unscheduled areas, including his hip and pelvis. Permanent placement of the filter is sufficient evidence of this, as is the permanent restrictions resulting from the filter.[5] Towers will also permanently wear a compression stocking to address recurrence of DVT. The commissioner's determinations are supported by substantial evidence, and application of the law to those facts was rational.

**B.    Amount of Industrial Disability**

AWS claims the commissioner's award of a sixty percent industrial disability is not supported by substantial evidence and is the product of an irrational, illogical, or wholly unjustifiable application of the law to the facts.

"The extent of industrial disability is a question of fact . . . for the commissioner." *Bearce v. FMC Corp.*, 465 N.W.2d 531, 537 (Iowa 1991). Industrial disability measures the individual's lost earning capacity. *Myers v. F.C.A. Services, Inc.*, 592 N.W.2d 354, 356 (Iowa 1999). The amount of industrial disability is determined by comparing the worker's pre- and post-injury earning capacity. *Hill v. Fleetguard, Inc.*, 705 N.W.2d 665, 673 (Iowa 2005). "We determine loss of earning capacity by considering the employee's functional

---

[5] This is not to say we agree that all DVT injuries are automatically or presumptively to the body as a whole. The commissioner relies upon a single Iowa Supreme Court case to conclude as such. *See Blacksmith v. All-American, Inc.*, 290 N.W.2d 348 (Iowa 1980). In *Blacksmith*, the court examined a worker suffering from phlebitis of the left leg, an inflammation of the vein wall, which was compensated industrially. *Id.* at 353–55. The commissioner used this case to infer our supreme court would consider any similar vascular injury to the lower extremity to be an injury to the body as a whole. We do not necessarily agree *Blacksmith* lends itself to such a conclusion, however because we have found support for the commissioner's ultimate conclusion on another basis, we need not reach the issue.

impairment, age, education, work experience, qualifications, ability to engage in similar employment, and adaptability to retraining to the extent any of these factors affect the employee's prospects for relocation in the job market." *Id.*

Towers is forty-six years old. He earned below-average grades in school, did not finish high school, has little specialized training, and has a limited earning capacity. Prior to his injury, Towers was earning $11.07 an hour as an unskilled industrial laborer, though with benefits his union compensation package totaled $28.80 per hour. If he had been able to complete the glazier apprenticeship program, his eventual wage would have been, with benefits, $38.50 per hour. Towers presently delivers auto parts for $8.00 an hour.[6] Towers testified the union informed him they would be unable to place work for him as a glazier with his current restrictions. There is uncertainty in the record as to whether Towers would be able to work as a glazier or not. AWS, who does not have a position available for Towers, offered evidence of glazier job requirements that could accommodate Towers's restrictions. In the AWS job description, the maximum lifting requirement was only forty pounds, with all work indoors on flat surfaces. Towers testified this was an inaccurate job description and did not represent the typical glazier job requirements for smaller firms that might offer him work.

AWS relies primarily upon the fact Towers's future as a glazier was speculative. He had not begun the apprenticeship program, though he was working in a shop that employs glaziers. Towers classifies his job as an

---

[6] Towers's present employer offers fewer benefits. A small amount is placed into retirement and Towers has elected to decline company health insurance. It is difficult to calculate how his present wage compares to the total compensation package he received at AWS, or would have received as a journeyman glazier.

industrial shop worker/glazier, while AWS calls him an industrial shop worker. An AWS employee testified that Exhibit 13 was an accurate job description for Towers while he was employed at AWS. Exhibit 13 describes the position as "Industrial Work – Glazier." As a result, there is substantial evidence to conclude Towers was on the path to becoming a glazier and was hired in that capacity. Viewed in that light, the injury substantially impacted his earning capacity. Not only is he unable to reenter the apprenticeship program and become a glazier, but his permanent restrictions limit his capacity to engage in manual labor, the only work for which he is reasonably suited. Whether we would arrive at the same precise level of industrial disability as the commissioner is immaterial.[7] We find substantial evidence in the record to support the commissioner's findings.

**AFFIRMED.**

---

[7] The commissioner does overstate Towers's status in one respect. Dr. Troll's five percent whole-body impairment rating, which was later amended to apply only to the lower extremity, is cited as proof of functional capacity. The citation, however, is in a section of the commissioner's appeal decision discussing whether Towers suffered a whole-body injury. But because the rest of the analyses of Towers's functional capacity and earning potential are accurate, we find the over statement to be immaterial.