**Donald R. DEAVER, Appellant,**

v.

**ARMSTRONG RUBBER CO., and American Mutual Liability Insurance Co., Appellees.**

**No. 53416.**

Supreme Court of Iowa.

Sept. 5, 1969.

456

Davis, Huebner, Johnson & Burt, Des Moines, for appellant.

Steward, Hopkins & Bump, Des Moines, for appellees.

MASON, Justice.

This is an appeal by Donald R. Deaver, claimant in a workmen's compensation proceeding, from judgment of the Polk district court reversing the deputy industrial commissioner's decision awarding claimant additional compensation in a review-reopening.

Plaintiff was injured on the job July 22, 1963, while working for Armstrong Rubber Company when a steel molding ring weighing approximately 30 pounds slipped from a shelf striking his head. Aside from the few days in which Deaver attempted to work he was off the job from the date of the accident until sometime in the middle of November.

August 7 the employer's liability insurance carrier filed a memorandum of agreement as to compensation with the commissioner. It was approved. Section 86.13, Code, 1966. March 9, 1964, the carrier filed a report of workmen's compensation benefit payments disclosing claimant had been paid $308.85 in weekly benefits and had been furnished professional and hospital services in the care and treatment of his injuries totaling approximately $432.10.

April 14, 1965, Deaver filed the petition in review-reopening against his employer and its insurance carrier for recovery of additional benefits under sections 86.34 and 86.35 of the Iowa workmen's compensation act for the results of the injuries sustained July 22, 1963, alleging he was then permanently and totally disabled for industrial purposes under the provisions of this act.

Hearings were held July 28, 1965 and April 20, 1967, with the last evidentiary deposition in the matter being taken September 7.

In these hearings claimant contended that at all times subsequent to the employment injury incurred at Armstrong he was plagued by headaches and tension which forced him to miss work frequently and in one instance required him to leave the regional managership with Kenron Manufacturing Company. Therefore, he was entitled to permanent partial disability benefits under the Iowa workmen's compensation law because of impaired income producing ability.

In his decision the deputy commissioner declared the issue was whether claimant sustained a permanent disablity as the result of the July 22 incident and if so, to what extent.

On a review-reopening hearing before the deputy commissioner claimant has the burden of establishing by a preponderance of the evidence that he suffered an impairment or lessening of earning capacity as a proximate result of his original injury, subsequent to the date of the award or agreement for compensation under review, which entitles him to additional compensation. Wagner v. Otis Radio & Electric Co., 254 Iowa 990, 993–994, 119 N.W.2d 751, 753; Olson v. Goodyear Service Stores, 255 Iowa 1112, 1120, 125 N.W.2d 251, 256–257; Giere v. Aase Haugen Homes, Inc., 259 Iowa 1065, 1070,

146 N.W.2d 911, 914; and Gosek v. Garmer and Stiles Co., Iowa, 158 N.W.2d 731, 732, and citations in these opinions.

December 8 the deputy commissioner filed his decision in the review-reopening proceedings finding claimant was suffering from a condition of manic depressive psychosis caused by the accident of July 22, 1963, which resulted in a permanent partial disability to the body as a whole to the extent of 25 percent.

Dr. Victor J. Cardenas, M.D., a Des Moines psychiatrist, the only medical witness called by plaintiff, described this mental illness as shown in the record of the transcript of evidence:

"In response to a question for a brief description of manic depression reaction the doctor stated that a manic depressive reaction is a mental illness that is characterized by swings in mood and one of these phases of the disease, the patient is primarily depressed. He is retarded in his thinking and his movements. He feels sad inside. He cannot sleep well. He doesn't eat well. He usually loses his appetite; at times loses weight. He might have crying spells and feel rather hopeless. In a way, this is the type of an enlarged reaction common to what everybody has, high and low periods, the difference being that it gets out of proportion."

The deputy further found that at the time of the hearing Deaver was earning essentially the same amount as he did at the time of injury; however, he stated further examination of the evidence demonstrated Deaver was capable of earning substantially more. Since the claimant's disability was outside the schedule it was to be evaluated as industrial which included considerations of age, education and ability to perform work. Citing Martin v. Skelly Oil Co., 252 Iowa 128, 106 N.W.2d 95. He defined disability for purposes of the workmen's compensation act to mean impairment or lessening of earning capacity. Citing Diederich v. Tri-City R. Co., 219 Iowa 587, 258 N.W. 899; Yeager v. Firestone Tire & Rubber Co., 253 Iowa 369, 112 N.W.2d 299.

"It is true the kind of disability with which the Compensation Act is concerned is industrial, not functional, disability. It is disability which reduces earning capacity, not merely bodily functions. Functional disability is an element to be considered in determining the reduction of earning capacity but it is not the final criterion. * * * [Citing authorities]." Olson v. Goodyear Service Stores, supra, 255 Iowa at 1120, 125 N.W.2d at 256.

The deputy commissioner ordered Armstrong and its carrier to pay Deaver for 125 weeks at $38 per week, plus healing period of 25 weeks at $46 per week, less the $308.85 already paid claimant.

I. January 4, 1968, Armstrong Rubber Company and its insurance carrier filed with the industrial commissioner their notice of appeal to the district court from the review decision of the deputy commissioner. Code section 86.26. Their appeal, based on three of the statutory grounds provided by section 86.30, states:

"There was not sufficient competent evidence in record to warrant the order made by the Deputy Industrial Commissioner.

"That the facts found by the Deputy Industrial Commissioner do not support the award of a permanent disability of the body.

"That the Deputy Industrial Commissioner acted in excess of his powers in awarding a healing period of twenty-five (25) weeks."

■ We point out the four grounds of appeal listed in this Code section are exclusive. See Olson v. Goodyear Service Stores, supra.

That appeal was submitted on the transcript of the evidence considered by the deputy commissioner. Section 86.29.

Fraud is not claimed here.

"We have repeatedly construed these provisions [section 86.30] as making the commissioner's findings of fact conclusive on appeal where the evidence is in dispute or reasonable minds may differ on the inferences fairly to be drawn from the facts. Such findings may have the standing of a jury verdict. That is, if the evidence presents a question which should be submitted to a jury, if trial were to a jury, then the court is bound by the commissioner's findings. This is true even though the court might arrive at a different conclusion from the evidence. * *· * [Citing authorities].

"It is the commissioner, not the court, who weighs the evidence. * * * [Citing authority].

"The commissioner's findings will be broadly and liberally construed and to uphold, rather than defeat, his decision. * * * [Citing authorities]." Wagner v. Otis Radio & Electric Co., supra, 254 Iowa at 993, 119 N.W.2d at 752–753. See also Olson v. Goodyear Service Stores, supra; Crees v. Sheldahl Telephone Co., 258 Iowa 292, 294, 139 N.W.2d 190, 192; Giere v. Aase Haugen Homes, Inc., supra, 259 Iowa at 1070, 146 N.W.2d at 914; and Musselman v. Central Telephone Co., Iowa, 154 N.W.2d 128, 130.

■ The rule controlling the appeal from the commissioner's decision to the district court and thence to this court is not de novo and as stated before the findings of the commissioner have the force and effect of a jury verdict. Giere v. Aase Haugen Homes, Inc., supra, 259 Iowa at 1070, 146 N.W.2d at 914; Poole v. Hallett Construction Co., Iowa, 154 N.W.2d 716, 717; and Paveglio v. Firestone Tire and Rubber Co., Iowa, 167 N.W.2d 636, 640, and authorities cited in these opinions.

It is for the fact finder to determine the ultimate probative value of all the evidence. Giere v. Aase Haugen Homes, Inc., supra, 259 Iowa at 1073, 146 N.W.2d at 915.

Although defendants stated several grounds in their appeal to the district court only one was argued; that is, lack of sufficient competent evidence in the record to warrant the order made by the deputy industrial commissioner.

In reversing the deputy industrial commissioner's award the district court found there was a lack of sufficient competent evidence to warrant a finding of causal connection between the head injury and permanent disability suffered by claimant.

The court reasoned the nature of claimed permanent disability and its causal connection with the accident of July 22, 1963, is not within the knowledge and experience of ordinary laymen and must be established by competent medical testimony. Citing Bradshaw v. Iowa Methodist Hospital, 251 Iowa 375, 382–383, 101 N.W.2d 167, 171–172, and authorities cited in this opinion. He found such testimony was lacking since there was no medical opinion the accident of July 22, 1963, "could" have caused claimant's permanent disability.

II. As propositions relied on for reversal claimant contends the district court erred in (1) making findings of fact contrary to those of the industrial commissioner which were supported by substantial evidence and (2) determining there was insufficient evidence presented to form a fact question as to medical causal connection for the commissioner's finding of industrial disability.

■ It is our duty to examine the evidence to determine whether it is sufficient to support the factual conclusion of the deputy commissioner. Crees v. Sheldahl Telephone Co., supra, 258 Iowa at 294, 139 N.W.2d at 192; Murphy v. Franklin County, 259 Iowa 703, 705, 145 N.W.2d 465, 467. This is the real test. Olson v. Goodyear Service Stores, supra; Gosek v. Garmer and Stiles Co., supra, Iowa, 158 N.W.2d at 732.

Bearing in mind the principles applicable to this examination we consider only the

evidence favorable to the deputy's findings, whether or not it was contradicted. See Tuttle v. Longnecker, 258 Iowa 393, 396, 138 N.W.2d 851, 853.

Deaver testified at the July 1965 hearing and a later resumed hearing. As a result of the blow to the head July 22, 1963, he was momentarily incapacitated to some extent although he knew he was lying on the floor. Shortly he went to the first-aid room, stayed about an hour while the nurse bandaged his forehead, gave him aspirin and had him lie down. Later he was sent to Dr. Burgeson at Lutheran Hospital in Des Moines for examination and was advised to stay home three or four days. His headaches continued and when he was unable to get relief he was admitted to Mercy Hospital in September under the care of Dr. Bakody, M.D., a neurosurgeon, who referred him to Dr. Cardenas. After spending seven to ten days in the hospital he was released but when his headaches continued Deaver was admitted to Hillcrest Psychiatric Clinic October 5 where he remained under Dr. Cardenas' care until November 4 receiving electroshock therapy. The headaches remained constant.

Before he went to Hillcrest Deaver attempted to return to Armstrong in September for a few days; however, the headaches continued to worsen and he was unable to work. Dr. Cardenas released Deaver in November but the doctor at Armstrong would not permit him to return to work until about November 14. He continued at Armstrong until February or March 1964.

Deaver, a high school graduate, was in the Marine Corps three years. While serving in Korea he was hospitalized for hemorrhagic fever which Dr. Cardenas described as "actually a symptom of several diseases of fever, bleeding, delirium and fatigue. It affects the patient mentally, he can be depressed and may retain severe headaches. If the only symptom of hemorrhagic fever is headache, it can be mistaken for any disease and the headaches can recur." After returning to the States he was stationed in North Carolina for three or four months, receiving medical care for nerves for about a month. In 1955 or 1956 he received a medical discharge and started working for Armstrong in 1957. Before the employment injury at Armstrong he had never been examined or treated for headaches, had never experienced the type of headaches he had thereafter. Since the injury they have continued with frequency. He had no other particular emotional problems outside of the events in 1963 described hereinafter.

After being permitted to return to work at Armstrong Deaver was not getting along with the company doctor. He felt friction had developed because of his having consulted another doctor. He was put on a separate job under constant supervision of a foreman. This was a new situation. During this period he was getting along fine with other employees. Although they talked to him, never said anything out of line, he did think they stopped their conversations when he approached. He had a guilty feeling—being in an institution. He believed the supervisory personnel thought he was "goofing off". He claims Armstrong did not cooperate with him in returning him to work after the accident when he was first able, didn't permit him to return to his old job even after request and criticized his work on the job assigned.

He testified that although he couldn't actually see it, he suspected the supervisory personnel laughed at him. He described the situation as "an air at the plant as if I were trying to pull something over on the company."

He was unable to perform his job because of headaches and dizziness. Finally Deaver terminated his employment at Armstrong, went to work for Kline Distributing Company as a salesman in hope he could get away from all this and that new environment would relieve some of the tension. It did temporarily.

Deaver had been earning approximately $110 per week at Armstrong and from $200 to $260 per week at Kline until July 1964. While working for Kline Deaver felt physically well but still had headaches and slight dizziness.

In August 1964 he went to work for Kenron Manufacturing Company in Des Moines selling aluminum and glass home improvements at a starting salary of $50 per week. After working in Des Moines he was transferred to Indianapolis for over a year earning $200 weekly. He was then advanced to general manager for Georgia earning $250 weekly. In Atlanta he took over an office which had been left in turmoil. His duties were over sales, installation and an office force of 20 to 25 people. From August 15 to November 15 he added to the company's customer relations, hired men, and built up sales force to a point their production was among the company's top 15 branches.

For the last part of the period in Atlanta Deaver started being depressed and things became worse. He had headaches most of the time; as strain and tension increased with time his condition grew worse. Finally he just got depressed and more or less said, "The heck with it all." During the last month with Kenron he lost 70 pounds. After leaving Kenron he had no gainful employment until February 20, 1967, when he moved to Mesa, Arizona.

Walter Kline, operator of the retail marine business, had known Deaver before employing him in 1964, described him as an excellent employee who worked better than eight hours a day, seven days a week during their seasonal business and considered him a very competent and enthusiastic salesman. Kline knew Deaver took medication for severe headaches which he believed continued and recalled a few weeks when Deaver did not act as alert or congenial as was his usual nature, although he noticed no periods of exaltation or contrasting depression any more than anybody engaged in Kline's type of business experiences.

George Huggins, a regional manager of Kenron Manufacturing Company in Des Moines, first met Deaver in July 1964 when he was assistant manager and Deaver a trainee for the company. About two months later Huggins was transferred to Indianapolis where he next saw Deaver in January 1965. Deaver was then considered one of the better men with the company. After a year in Indianapolis selling company products Deaver was transferred to Georgia.

Huggins had a daily and monthly record of Deaver's performance while in Indianapolis. Because of either headaches or earaches he missed work on an average two or three days a week, at times his absence lasted two to three weeks. When he did work he did very well and was a top salesman. Deaver indicated he lost four days' work the last month at Kenron which was possibly the average.

At the time of the resumed hearing Deaver was living in Mesa earning in excess of $100 a week as a filling station attendant.

Claimant testified that when he had the headaches described he would take aspirin, try to rest and stay off his feet, but on occasion has had headaches on the job and continued to work. He contends this slowed down his thinking capacity and cost him sales of Kenron's products. He became subject to headaches as tension mounted and has been having difficulty remembering things. The headaches, tension and memory problems have persisted and grown worse since July, 1963. He did not have these complaints prior to the injury. The last time he saw a doctor for headaches was in the summer of 1964.

Dr. Cardenas, whose practice is limited to psychiatry, holds membership in various county, state and national medical associations. He saw Deaver October 5, 1963, at Dr. Bakody's request after the patient had been examined neurologically and no organic factors were found to substantiate his complaints of persisting headaches.

When examined by Cardenas Deaver complained he was not sleeping well, was suspicious, irritable, was crying and gave a history of having been that way several days before the visit with the doctor. Cardenas made a preliminary diagnosis of depression and recommended Deaver be admitted to Hillcrest, a psychiatric hospital.

As a witness the doctor, evidently referring to his previous written report, testified that at the time of examination he noted, "The prognosis in this case is guarded, since apparently there were no suggestions of strong provoking factors for its development." He did consider those factors he had opportunity to get from a clinical standpoint. They were Deaver's work enviroment and all things connected with it. The other factor he could not substantiate "was perhaps the history of the same thing in his [Deaver's] family."

When asked specifically about his consideration of Deaver's absence from work he replied that when he made his report he recorded, "I have come to the conclusion that his being away from his work and worrying about what other people will think of him by not being at work, by provoking him, could have subsequently provoked the depression." He was unable to clinically establish or substantiate any other causative factors.

The doctor stated there was nothing reflected in the history given him of any emotional illness or physical injury or illness between the time of Deaver's discharge from the Marines and the time of the accident at Armstrong. It was his opinion claimant did not have hemorrhagic fever while under his care. "[T]he symptomatology that Mr. Deaver had did not correspond to the symptomatology of hemorrhagic fever."

Assuming Deaver's inability to work as observed by the doctor was occasioned by the accident, Cardenas expressed the opinion that Deaver's being away from work had an effect of psychological trauma on him.

Defendant's timely objection to the admissibility of the evidence sought to be elicited by plaintiff's hypothetical question somewhat summarized urged as grounds that the question was a misstatement of the record, omitted material facts and called for evidence that was incompetent, irrelevant and immaterial.

■ Counsel who objects to a hypothetical question on the ground that it contains statements not shown in the record or omits statements from the record has the duty to advise the court in what particular respect it fails to state the record properly so the adversary may have an opportunity to remedy the alleged defect, if possible, by correcting or eliminating statements objected to. Reversible error may not be predicated upon an objection which does not tell the court the ground upon which it is based. Crozier v. Lenox Mutual Ins. Assn., 252 Iowa 1176, 1183, 110 N.W.2d 403, 407; Kunzman v. Cherokee Silo Co., 253 Iowa 885, 893, 114 N.W.2d 534, 538–539, 95 A.L.R.2d 673; In re Ronfeldt's Estate, Iowa, 152 N.W.2d 837, 846; and Van Aernam v. Nielsen, Iowa, 157 N.W.2d 138, 143.

■ In so holding we recognize "strict rules of evidence are not to be applied in proceedings before the industrial commissioner. Nonetheless, some rules must apply." See Giere v. Aase Haugen Homes, Inc., supra, 259 Iowa at 1074, 146 N.W.2d at 916. Defendant's objection preserves no error for consideration in this court.

Dr. Cardenas found Deaver complaining of depression and tension with depression most prevalent. It was his opinion the manic depressive psychosis Deaver had in 1963 "can recur at no specific time in the future, which means he may have relapses of this condition."

The doctor believed the episodes could recur in the future and the symptoms Deaver complained of, tension and depres-

sion, could have been an episode he might develop, an episode of the same phychosis he had in 1963.

The doctor was then asked, "Could this condition produce the feeling of inability to work so that a man such as Mr. Deaver would lose time from his employment because he'd become depressed from recurring depression from this psychosis? Could that occur? * * *."

He replied, "That could happen, that's right. That's what happens when you have a depression and you lose your ambition. * * * It could happen that he loses ambition when he is depressed and he doesn't go to work * * *."

The doctor was of the opinion that the symptoms of recurring depression and tension would continue for some period of time into the future—for many years.

At the time the doctor testified he had not seen Deaver since his release from Hillcrest. On December 9, 1963, he gave the company doctor his reaction to Deaver's condition as being another depressive reaction.

The direct and cross-examination of this witness covers some 26 pages in the printed record. It is summarized in the commissioner's findings:

"Dr. Cardenas, M.D. was called by the claimant and testified that the claimant was suffering from a manic depressive psychosis. It was his opinion claimant's being away from work and worrying about what other people think of him not being at work 'could have' provoked the depression. He further stated he could not establish or substantiate any other causative factors which may have attributed to the subsequent depression. The doctor stated it was very possible that due to various enviromental pressures Mr. Deaver may experience episodes of depression and periodic relapses in the future. The doctor said that examinations by Dr. John T. Bakody revealed no organic condition which would cause the depression."

The deputy further recites in his findings:

"Prior to the incident of July 22, 1963 claimant had experienced good physical health and had no problems or complaints similar to those described after the accident. Dr. Cardenas, upon examination and treatment of claimant, testified it was his opinion claimant was suffering from the condition of manic depressive psychosis and such was causally connected with the incident of July 22, 1963. Further testimony indicated that since the accident claimant had become less capable of earning and experienced some loss of memory, he no longer has the ambition and enthusiasm he had exhibited in the past. Therefore, the expert opinion of Dr. Cardenas and the non-expert testimony of claimant and those who knew claimant before and after the accident comply with the prerequisites the law requires to sustain an award."

As stated, Dr. Cardenas testified that in his report of claimant's earlier examination he had recorded, "I've come to the conclusion that his [Deaver's] being away from his work and worrying about what other people will think of him not being at work, by provoking him, *could* have subsequently provoked the depression" (Emphasis supplied). The deputy's finding it was Cardenas' opinion claimant was suffering from manic depressive psychosis and such was causally connected with the incident of July 2, 1963, was predicated on this evidence.

In making this finding the commissioner recognized the pronouncement in Bradshaw v. Iowa Methodist Hospital, supra, 251 Iowa at 380, 101 N.W.2d at 170, which was again approved in Mabrier v. A. M. Servicing Corporation of Raytown, Iowa, 161 N.W. 2d 180, 182–183, in this language:

"Medical testimony that it is possible a given injury was the cause of subsequent disability, or 'could have' caused it, is insufficient, standing alone, to establish causal connection. * * * [Citing authority].

" 'However, when expert evidence of possible causal connection is coupled with other testimony, nonexpert in nature, that plaintiff was not afflicted with any such condition prior to the accident, then the question is for the jury. * * * [Citing authorities].' "

Here we have a psychiatrist whose specialty deals with the mind and who, of course, must be tentative in his pronouncements as to cause and effect. However, in his testimony he does state that in his 1963 diagnosis a factor which could have provoked claimant's depression was his being away from his work and worrying about what other people would think of him by not being at his work. No other causative factors were found.

As we understand claimant's position he does not contend the forehead laceration received July 22, 1963, resulted in permanent physical injury but maintains he is presently suffering from a mental illness caused by the employment injury. He relies on Dr. Cardenas' opinion the absenteeism from July 22 to November 14 could have caused the disability he suffered. In effect, not a physical injury, but gradual strain and worry caused by claimant's fear of what his employer and fellow workmen would think of his absence was the source of disability. The injury then was not the blow to claimant's head inflicted by the steel ring but the three months' absence from work.

"Our question is not whether there is sufficient evidence to warrant a decision the commissioner did not make, but rather whether there is sufficient evidence to warrant the decision he did make." Coghlan v. Quinn Wire & Iron Works, Iowa, 164 N.W.2d 848, 852. Citing Musselman v. Central Telephone Company and Wagner v. Otis Radio & Electric Co., both supra.

■ There is substantial evidence to support the deputy's findings of fact set out, supra, and generate a fact question as

to medical causal connection for his finding of industrial disability.

III. A large part of defendant's cross-examination of Dr. Cardenas was directed toward establishing the fact there may be many precipitating factors to claimant's type of depression. The doctor said he had not been furnished by way of history any other precipitating factor or factors in Deaver's case and agreed in the absence of external factors of a precipitating nature he would have to say the recurring episodes of depression are extrinsic in nature and the result of the condition itself.

" * * * [W]hether an injury or disease has a direct causal connection with the employment or arose independently thereof is 'essentially within the domain of expert testimony.' Bradshaw v. Iowa Methodist Hospital, 251 Iowa 375, 383, 101 N.W.2d 167, 171, and citations. However, the weight to be given such an opinion is for the finder of fact, and that may be affected by the completeness of the premise given the expert and other surrounding circumstances."

"When an expert's opinion is based upon an incomplete history, the opinion is not necessarily binding upon the commissioner or the court. It is then to be weighed together with the other disclosed facts and circumstances, and the ultimate conclusion is for the finder of the fact. * * * [Citing authorities]." Bodish v. Fischer, Inc., 257 Iowa 516, 521–522, 133 N.W.2d 867, 870.

■ Acceptance or rejection of the expert's testimony is within the "peculiar province" of the industrial commissioner. See authorities cited in Bodish. This does not mean the commissioner as trier of fact may totally disregard evidence, but he has the duty to weigh the evidence and determine credibility of witnesses. Re Claim of Gwynne v. Vance, 258 Iowa 875, 879, 140 N.W.2d 917, 919.

IV. In support of the district court's finding there was no expert testimony the

accident of July 22, 1963, could have caused claimant's personal disability defendants further contend the foundation was inadequate for Dr. Cardenas to express a causal opinion regarding the episode he treated in 1963. They emphasize the fact Cardenas did not see Deaver until October 5, 1963, and of necessity his opinion as to causal connection must be based on the history of the accident received from some source. They maintain the only information Cardenas obtained about the accident was from the undisclosed contents of a hospital chart prepared by someone not identified in the record. His opinion was therefore no more than conjecture, speculation and surmise.

■ Of course, the successful party may, without appealing or assigning errors, save the judgment *if an error* was committed against him which, if corrected, will make the result reached by the trial court a right result. Iowa Elec. Co. v. Home Ins. Co., 235 Iowa 672, 676, 17 N.W.2d 414, 416; 1967 Senior Class of Pekin High School v. Tharp, Iowa, 154 N.W.2d 874, 876, and citations. However, this principle fails to help defendants under the circumstances here.

■ We assume defendants rely on their motion to strike the doctor's testimony at the conclusion thereof as sufficient to present the question. The motion is not sufficient for the reasons stated in Division II, supra, relative to the duty of counsel objecting to a hypothetical question. A similar rule applies where a party objects to the offer of evidence on the ground no proper foundation has been laid to permit the witness to express an opinion. He must likewise point out in what particular or particulars the foundation is deficient so the adversary may have an opportunity to remedy the alleged defect, if possible. State v. Entsminger, Iowa, 160 N.W.2d 480, 482–483, and citations.

Our review of the record does not disclose defendants' motion was ever ruled on or that defendants requested a ruling. See State v. Hephner, Iowa, 161 N.W.2d 714, 717, where we quote from Shover v. Iowa Lutheran Hospital, 252 Iowa 706, 721, 107 N.W.2d 85, 93–94 and 4 C.J.S. Appeal & Error § 321e, page 1026.

No error was committed against defendants. The rule stated in 1967 Senior Class of Pekin High School v. Tharp, supra, does not apply here.

Defendants rely on Dougherty v. Boyken, Iowa, 155 N.W.2d 488. Nothing said there helps them under the present factual circumstances.

V. In Gosek v. Garmer and Stiles Company, supra, Iowa, 158 N.W.2d at 733, we recognize that there is "respectable authority to the effect that when there has been a compensable accident, and claimant's injury related disability is increased or prolonged by a trauma connected neurosis or hysterical paralysis, all disability, including effects of any such nervous disorder, is compensable. * * * [Citing authorities]." See also 1A Larson's Workmen's Compensation Law, section 42.23, pp. 622.-177–622.178.

Coghlan v. Quinn Wire & Iron Works, supra, Iowa, 164 N.W.2d 848, involved an appeal from the judgment of the district court affirming the deputy industrial commissioner's decision in a review-reopening hearing. The deputy found claimant sustained an employment injury which aggravated, accelerated or precipitated a manic depressive psychotic condition which caused claimant to be totally disabled. Employer and its insurance carrier contended claimant's evidence was insufficient to establish a causal connection between his psychotic condition and the injury. In affirming on the issue of sufficiency of evidence to support the deputy's finding of causal connection the question whether claimant's disability was compensable under the workmen's compesation act was not raised or reached.

Code section 85.61(5) does not define "injury" or "personal injury". However, in

Sollitt Construction Co. v. Walker, 127 Ind.App. 213, 135 N.E.2d 623, 627, it is said:

" * * * [T]he term 'injury' as used in the Workmen's Compensation Act, * * is broader than mere reference to some objective physical break or wound to the body, but includes also the consequences therefrom, including mental ailments or nervous conditions." See Carter v. General Motors Corp., Chevrolet G. & A. Division, 361 Mich. 577, 106 N.W.2d 105, for a discussion of the compensable nature under the workmen's compensation act of the loss of earning capacity caused by mental or emotional disability resulting from a physical injury where cases from other jurisdictions are collected and analyzed.

■ Ordinarily, compensation is awarded for incapacity to earn or industrial disability and not for the injury as such. In support see Diederich v. Tri-City R. Co., supra, 219 Iowa at 593, 258 N.W. at 902; Yeager v. Firestone Tire & Rubber Co., supra, 253 Iowa at 375, 112 N.W.2d at 302.

In reaching its conclusion there was not sufficient supporting evidence in the record the July 22, 1963, accident "could" have caused claimant's permanent disability the trial court unduly limited interpretation of the term "injury". Enforced absence from work for a time after an injury is not different from the pain and shock which normally accompany such an accident. Each is the result of the injury and should be treated as part of it.

The decision of the deputy commissioner that claimant suffered permanent industrial disability has substantial support in the record.

For judgment reversing that appealed from and affirming the review decision of the deputy commissioner filed December 8, 1967, the cause is

Reversed and remanded.

All Justices concur, except LeGRAND, J., who dissents.