**IN THE COURT OF APPEALS OF IOWA**

No. 14-0956
Filed April 22, 2015

**ARCHER DANIELS MIDLAND, INC.,**
        Plaintiff-Appellant,

**vs.**

**ROBERT WARREN,**
        Defendant-Appellee.
_____


        Appeal from the Iowa District Court for Polk County, Richard G. Blane II,

Judge.


        An employer appeals from the judicial review decision affirming the

workers' compensation commissioner's award of permanent total disability

benefits to Robert Warren.  **AFFIRMED.**



        Jordan A. Kaplan and Mark A. Woollums of Betty, Neuman & McMahon,

P.L.C., Davenport, for appellant.

        Bob Rush of Rush & Nicholson, P.L.C., Cedar Rapids, for appellee.



        Heard by Vogel, P.J., and Potterfield and Mullins, JJ.

**POTTERFIELD, J.**

Archer Daniels Midlands, Inc. (ADM) appeals from the judicial review decision affirming the workers' compensation commissioner's award of permanent total disability benefits to Robert Warren. On appeal, ADM contends the district court erred in failing to remand this case to the commissioner for reevaluation after the district court found one physician's opinion of causation was a "nullity," and argues the causation determination in the absence of that opinion is not supported by substantial evidence. ADM also maintains Warren's pre-injury-date retirement plans—as a matter of law—preclude an award of permanent total disability.

Because the commissioner weighed the expert opinion evidence thoroughly and documented its finding of causation, and the district court accepted the finding of the commissioner as supported by substantial evidence in the record, we affirm the causation finding. Additionally, we do not find the commissioner's determination as to industrial disability was irrational, illogical, or wholly unjustifiable. We therefore affirm the district court's decision affirming the Iowa Workers' Compensation Commissioner's award of permanent total disability benefits to Warren.

**I. Background Facts and Proceedings.**

Evidence at the arbitration hearing established Warren was born in February 1949, completed the ninth grade, and later obtained his G.E.D. He attended Kirkwood Community College and earned diplomas or certificates in welding, blueprint reading, and pipe fitting. In 1969, Warren suffered a severe, traumatic right-hip injury after falling twenty-eight feet from a roof that collapsed.

The fall resulted in a comminuted fracture of the intertrochanteric area of the right femur and fractures to the olecranon. Warren underwent a Jewett hip nailing procedure involving a three and one-half inch nail, a four inch plate, and metallic screws.

Warren worked as a welder from 1974 until 1986 when that employer's plant closed. From 1975 to 1976, Warren had complained of pain in the right hip and had an x-ray showing "some motion about the Jewett nail." At his doctor's recommendation, Warren had the Jewett nail removed. On February 27, 1976, Dr. J. Huey noted Warren's leg was well healed and released him to return to work. In 1980, Warren was seen once for left hip pain. Dr. Huey noted leg lengths were equal and commented "[h]is right hip has an old varus deformity from a fracture but it looks pretty good, really. It has healed solidly and the head is viable. The left hip reveals no evidence of degenerative arthritic change." Warren worked for a different employer's manufacturing business from 1987 to 2000. He then drove a semi-truck for about six months.

On March 19, 2001, Warren began working for ADM. His health was "excellent" when he started and he was under no restrictions. He worked for six months in a warehouse moving and stacking bags. From there, he moved to his permanent job—refinery utility. As a utility worker, Warren was responsible for moving railcars (preparing them to carry corn syrup) and directing trucks into proper filling position. Warren's position included twelve- to sixteen-hour work days, lifting up to one hundred pounds much of that time. His work "was heavy, physical labor that required walking on uneven ground, standing, crawling, stooping, climbing onto and into and out of railcars, climbing steps, bending,

twisting, lifting, and pulling, amongst other strenuous physical acts." He fell several times on the uneven rail yard terrain.

Warren's right hip began to bother him when the rail car staging area was expanded, which caused him to walk more. He was taking ibuprofen and Tylenol, but these over-the-counter medications provided only limited relief. On January 28, 2009, Warren went to his family doctor, Dr. Yang Ahn, complaining of stiffness and pain. A prescription painkiller was prescribed. Pain in his hip was noted on an April 22, 2009 visit.

Warren's symptoms worsened and Dr. Ahn referred him to Dr. Michael Brooks for evaluation on July 31, 2009. Dr. Brooks' recorded history included a progressively worsening condition. The prescribed painkiller initially helped but eventually provided only moderate relief. Warren's employment was described as "a manual position loading and preparing railroad cars for corn syrup." Dr. Brooks assessed "[p]olyarthritis with a predominance of osteoarthritis." He gave Warren a steroid injection and prescribed a different painkiller. Dr. Brooks also ordered additional lab studies. On November 5, 2009, Dr. Brooks noted the lab studies "did not corroborate any systemic inflammation." Dr. Brooks indicated the new medications were providing "good overall pain response . . . but [Warren] continues to have significant arthralgias and myalgias in the arms and in the legs." Dr. Brooks concluded, "I've discussed the nature of his disease and the limits of our ability to treat at this point and have suggested he continue symptomatic control."

Warren returned to Dr. Brooks on May 5, 2010, reporting "significant symptoms of pain, stiffness and chronic fatigue with myalgias" and "problems

with right hip pain and stiffness." Additional pain medication was prescribed. Dr. Brooks noted, "I've discussed the possibility of sending him to one of the orthopedic surgeons but he's not anxious to consider that at the present time. We will monitor his response to these changes and see him back in 4-6 months."

The notes from a September 15, 2010 visit with Dr. Brooks include:

> [Warren] continues having symptoms of more diffuse arthralgias and myalgias are really more a predominance of pain in the right pelvic area down the right thigh. This is worse with walking on uneven ground and with weightbearing. He does have an antalgic gait when the symptoms become worse and he indicates that the symptoms are somewhat waxing and waning in terms of severity.
> . . . .
> We discussed the possibility of a total hip arthroplasty at length today. I reviewed with him the results of the x-ray and suggested that his hip pain is unlikely to get better unless something is done more definitively. He has multiple questions regarding his job situation if he does have the hip replaced and I answered those to the best of my ability but recommended that he at least have a consultation with one of the orthopedic surgeons to discuss the situation as well. He is thinking about that option at this point.

On September 22, 2010, Warren saw Dr. Sandeep Munjal, an orthopedic surgeon. Dr. Munjal noted, "His work does require significant lifting of loads and more than twelve hundred steps a day of rough walking." X-rays demonstrated "advanced degenerative changes in the right hip with hallmarks of previous surgery and a valgus alignment of the hip." Physical examination revealed a painful right hip, limping, and antalgic gait. Dr. Munjal assessed osteoarthritis of the right hip and "unexplained poly inflammatory arthropathy." Dr. Munjal "discussed hip replacement in great detail with the patient."

> Obviously there will be significant concerns regarding his job with especially the high amount of loading he has to do. I discussed hip replacement in great detail with the patient, including restrictions associated with that. He is thinking about surgery in

February/March prior to his retirement. Activity modifications after that.

On January 12, 2011, Warren returned to see Dr. Brooks and reported he was scheduled to have right hip joint replacement. "He is aware that he will not be able to continue his present job after the surgery due to the requirements of lifting, squatting and climbing associated with his present job." Dr. Brooks wrote further,

> I reviewed the situation with him and have elected to have him continue the meloxicam and call me with a report in terms of what exactly he's been doing with the tramadol before deciding on further pain medications. I like to get him through the surgery and off of work for a month or two prior to considering more medications and would therefore like to see him back again in about four months for reevaluation and assessment of what medications would make sense in his new situation after the surgery.

Warren underwent a right total hip replacement on February 22, 2011. On May 11, 2011, Dr. Munjal examined Warren and discussed returning to work:

> Regarding return to work, we gave him a return to work slip when FMLA is up May 17 with normal restrictions [fifty-pound weight limit; the restrictions also included no bending, climbing, crawling, kneeling, stooping, twisting or stair steps]. He will let us know if he needs anything additional to this . . . . The patient was encouraged to resume activities as tolerated. We will see the patient back at one year from the time of surgery or sooner if problems.

On May 13, 2011, Warren was seen for follow-up by Dr. Brooks. Dr. Brooks noted Warren "is recovering from [hip replacement] quite nicely although he is still very restricted in terms of his activities and it is clear that he is not going to be able to go back to work in his previous position because of the restrictions."

Warren returned to ADM, but was told his restrictions could not be

accommodated. Consequently, Warren's last date of employment with ADM was February 18, 2011.[1]

On April 5, 2011, Warren filed a petition seeking workers' compensation benefits for a cumulative injury. ADM sent Warren for an independent medical examination (IME) with Dr. William Boulden on June 15, 2011. In his report, Dr. Boulden opined "Warren's work activities with Archer Daniels Midland . . . did not accelerate or cause the osteoarthritis of his hip, for which he had the hip replacement." He also wrote,

> I believe Dr. Munjal's letter dated Febraury 11, 2010, basically states what I have stated; that the arthritis was not caused by the patient's work. The patient did physical activities at work and he states that the patent's symptoms may have been aggravated by his work, but once again, the arthritis was the cause of the operation and the pain is from the arthritis.

On March 13, 2012, Warren was seen by Dr. Ray Miller for another IME. Dr. Miller wrote:

> It is my opinion from evaluating Mr. Warren, his medical records, and his job requirements, that his work activity during his ten years at Archer Daniels Midland were significant physical activities that contributed to the progression of osteoarthritis resulting in the need for a total hip replacement. Those work requirements accelerated the osteoarthritis and the need for a hip replacement.

On March 19, 2012, Dr. Munjal signed off on a letter from ADM's attorney agreeing with Dr. Boulden that Warren's "symptoms may have been aggravated by his work, but once again, the arthritis was the cause of the operation and the pain is from the arthritis." On May 4, 2012, Dr. Munjal signed his name to a letter from Warren's attorney indicating he agreed with Dr. Miller that Warren's employment with ADM accelerated his right hip arthritis causing the need for the

---

[1] Warren was later found to be totally disabled for Social Security disability purposes.

total hip replacement. At a June 11, 2012 deposition, Dr. Munjal testified that Warren's work activities were not a cause of Warren's osteoarthritis. After being told the difference in the definition of probability and possibility, Dr. Munjal said "it is probable the increased pain was caused by lifting and all the work. Regarding arthritis, I would say possible because—or it's possible that, but I don't know the answer."

Following an arbitration hearing, the deputy commissioner determined, "The record evidence considered as a whole does not support a finding that claimant's right hip osteoarthritis and his need for a right hip replacement were rational consequences of his work activities for ADM." In the conclusions of law, the deputy commissioner wrote:

> As regards to claimant's claim of a right hip injury, Dr. Boulden's opinion that claimant's right hip osteoarthritis and need for right hip replacement surgery represented a progression of the right hip deformities that he had as a result of the valgus deformity he developed after his earlier trochanteric fracture and related surgery is well reasoned and accepted over the contrary causation opinion of Dr. Miller, which is not supported by a rational explanation. Claimant has not demonstrated that the right hip osteoarthritis that resulted in his having hip replacement surgery was a rational consequence of his work duties or that the condition was accelerated because of his work duties for ADM.

Consequently, the deputy denied Warren workers' compensation benefits. Warren appealed to the commissioner.

The commissioner reversed the deputy's arbitration ruling, finding:

> The law as to aggravation of preexisting conditions is well-settled. While a claimant is not entitled to compensation for the results of a preexisting injury or disease, its mere existence at the time of a subsequent injury is not a defense. *Rose v. John Deere Ottumwa Works*, 76 N.W.2d 756 (Iowa 1956). If the claimant had a preexisting condition or disability that is materially aggravated, accelerated, worsened or lighted up so that it results in disability,

claimant is entitled to recover. *Nicks v. Davenport Produce Co.*, 115 N.W.2d 812 (Iowa 1962); *Yeager v. Firestone Tire & Rubber Co.*, 112 N.W.2d 299 (Iowa 1961).

The presiding deputy commissioner's discussion of causation and of pain brought about by work duties does not appear to comport with the well-settled law of aggravation of preexisting conditions and is discounted as such a standard would place a far greater, if not insurmountable burden on an injured worker than does the standard set forth in *Nicks* and *Yeager*. Claimant need not prove any more than the work activities materially aggravated, accelerated, worsened, or lighted up the progression of his osteoarthritis and resulted in the need for the hip replacement surgery.

The commissioner observed that Warren's "employment duties were not significantly discussed within the arbitration decision." The commissioner wrote:

Further, [Warren] explained in great detail the duties of moving railcars, cleaning and inspecting the railcars, and ultimately filling the cars with product and removing the cars from the facility. Between [Warren's] testimony and the job description it is found that [Warren's] work was heavy, physical labor that required walking on uneven ground, standing, crawling, stooping, climbing onto and into and out of railcars, climbing steps, bending, twisting, lifting, and pulling, amongst other strenuous physical acts. [Warren] testified that due to the rough terrain in the rail yard that he had fallen several times. [Warren's] work required him to take steps to a control room where he input data into a computer. [Warren] worked 12-16 hours per day and had worked up to 80 hours in a week. [Warren] noted about five to six years prior to the arbitration hearing that his work duties had changed and brought forth more significant right hip complaints. [Warren] testified that:

> My hip—it got to the point where it was really bothering . . . . It got to the point where once I got down, it would be hard to get back up. My walking going up and down the steps got closer. My hip really started to bother me a lot. I was fighting the snow clear up to my knees and thighs at times, slipping, falling. Just—yeah; it really started to tear me up.

(Record citations omitted.)

The commissioner reviewed the records of Drs. Munjal, Boulden, and Miller and determined Warren "met his burden to prove that his right hip

replacement and disability arose out of and in the course of his employment duties with [ADM]." Further, the commissioner found Warren had sustained a twenty-percent impairment to the whole person. The commissioner concluded Warren "sustained a right hip injury through a cumulative process as an aggravation of claimant's preexisting hip condition. That injury manifested itself on February 18, 2011[,] when claimant left his employment for medical treatment for the hip condition."

The commissioner then addressed the issue of the "extent of claimant's loss of earning capacity as a result of his hip replacement." The commissioner considered the many factors of industrial disability and concluded Warren had "sustained an injury which permanently disables him from performing work within his experience, training, education, and physical capacities," entitling him an award of permanent total disability benefits commencing on February 19, 2011.

ADM filed a petition for judicial review in the district court. The district court found substantial evidence supported the commissioner's finding of causation, despite finding Dr. Munjal's varying statements in response to the attorneys' letters a "nullity." The district court wrote:

> However, the Court [] still finds that Dr. Miller's testimony sufficiently supports causation between work and the aggravation of the osteoarthritis, which aggravated the condition and necessitated surgery. The Court disagrees that Dr. Miller makes conflicting assertions. Dr. Miller is simply saying in his first opinion that no specific injury at work caused the Warren's pain in his hip but rather the normal physical labor contributed to the acceleration of his osteoarthritis. [ADM's] argument regarding the adjectives used to describe the contributing factors is also without merit; regardless of the adjectives used to describe the contributions, Dr. Miller still found the work activities contributed to the progression and acceleration of the osteoarthritis which necessitated surgery. Therefore, the Commissioner's finding that the Warren's right hip

osteoarthritis aggravation was proximately caused by the Warren's work activities is supported by substantial evidence. The existence of substantial evidence is especially apparent when the Commissioner's credibility determination of Dr. Boulden is considered.

 The Court also finds the Commissioner's credibility determination regarding Dr. Boulden is supported by substantial evidence. The Commissioner's determination that Dr. Boulden's opinion was conclusory seems to be based on the fact that he did not fully acknowledge the physical nature of the Warren's employment in his June 15, 2011 IME. This is supported by substantial evidence as Dr. Miller's IME on March 13, 2012 discussed the Warren's job duties in depth . . . .

 . . . .

 Last, the Court finds [ADM's] argument that the osteoarthritis is not work related without merit. As stated the Commissioner's finding of causation between work and the aggravation of the osteoarthritis was supported by substantial evidence.

 In conclusion, the Court finds that when the record is considered as a whole, the Commissioner's decision is supported by substantial evidence even when the evidence supplied by Dr. Munjal is not considered. Dr. Miller's opinion supports a causal link between the Warren's physical work and the aggravation of the osteoarthritis and subsequent surgery. [footnote omitted] Furthermore, the Commissioner's finding of lack of creditability in Dr. Boulden was supported by substantial evidence. Last, [ADM's] attempt to attribute the osteoarthritis to other causes fails.

ADM also contended the commissioner had not adequately considered Warren's "planned retirement" in the determination of industrial disability. The district court rejected this argument, holding the commissioner's industrial disability decision was not irrational, illogical, or wholly unjustifiable.[2]

The district court denied ADM's subsequent motion to amend its ruling in which it argued, "The Commissioner, not the Court, has authority to determine if Dr. Miller's opinion alone proves causation by a preponderance of the evidence."

ADM appeals.

---

[2] The district court did reverse the commissioner's assessment of costs of an audiology report associated with Warren's failed claims of hearing loss and tinnitus, and remanded to the commissioner for a corrected ruling.

**II. Scope and Standards of Review.**

Iowa Code chapter 17A governs our review of the commissioner's decision. *See* Iowa Code § 86.26 (2013); *Mike Brooks, Inc. v. House*, 843 N.W.2d 885, 888 (Iowa 2014). The district court acts in an appellate capacity when reviewing the commissioner's decisions to correct errors of law. *See Mike Brooks*, 843 N.W.2d at 888. "On appeal, we apply the standards of chapter 17A to determine whether we reach the same conclusions as the district court. If we reach the same conclusions, we affirm; otherwise we may reverse." *Id.* at 888-89 (citation and quotation marks omitted).

As the trier of fact, it is the commissioner's duty to weigh the evidence. *Arndt v. City of Le Claire*, 728 N.W.2d 389, 394-95 (Iowa 2007). We will only disturb the commissioner's finding fact if it is not supported by substantial evidence. *See* Iowa Code § 17A.19(10)(f) (defining substantial evidence as "the quantity and quality of evidence that would be deemed sufficient by a neutral, detached, and reasonable person, to establish the fact at issue when the consequences resulting from the establishment of that fact are understood to be serious and of great importance").

> Evidence is not insubstantial merely because different conclusions may be drawn from the evidence. To that end, evidence may be substantial even though we may have drawn a different conclusion as fact finder. Our task, therefore, is not to determine whether the evidence supports a different finding; rather, our task is to determine whether substantial evidence, viewing the record as a whole, supports the findings actually made.

*Cedar Rapids Cmty. Sch. Dist. V. Pease*, 807 N.W.2d 839, 845 (Iowa 2011) (citations omitted).

**III. Discussion.**

*A. Medical Causation.* As our supreme court has repeatedly emphasized, "[o]ur decision is controlled in large part by the deference we afford to decisions of administrative agencies." *Pease*, 807 N.W.2d at 844; *see Mike Brooks*, 843 N.W.2d at 889.

Medical causation presents a question of fact that is vested in the discretion of the workers' compensation commission. *Mike Brooks*, 843 N.W.2d at 889; *Pease*, 807 N.W.2d at 844-45; *Dunlavey v. Econ. Fire & Cas. Co.*, 526 N.W.2d 845, 853 (Iowa 1995). "[T]he determination of whether to accept or reject an expert opinion is within the 'peculiar province' of the commissioner." *Pease*, 807 N.W.2d at 845 (quoting *Deaver v. Armstrong Rubber Co.*, 170 N.W.2d 455, 464 (Iowa 1969)).

ADM argues that because the district court's analysis excluded Dr. Munjal's contradictory opinions, this case must be remanded to the commissioner to reweigh the evidence. ADM relies on *McDowell v. Town of Clarksville*, 241 N.W.2d 904 (Iowa 1976), for this proposition. We reject this argument.

The district court observed,

The Agency did not make any clear indication that its finding of a preponderance of the evidence required both doctors' opinions. There is no explicit evidence that the Agency would have found against causation if only Dr. Miller's opinion was available. The parts of the Agency's decision that [ADM] quotes show that the Agency is considering the opinions of the doctors collectively when deciding causation, but it does not show that both Drs. Miller's and Munjal's opinions are necessary to find causation and that Dr. Miller's opinion alone would be insubstantial.
More importantly, the Court's job on judicial review is to view the record as a whole to see if substantial evidence supports a

finding of fact. . . . The Court determined that there was substantial evidence after it considered the detracting evidence.

We find no reason to disturb the court's reasoning. While ADM characterizes the district court's ruling as a determination the commissioner erred in considering Dr. Munjal's testimony, the clear language used by the district court belies that characterization. The district court recognized that the commissioner had weighed the opinions of all three experts on the issue of causation, discussing the specifics of each doctor's statements and the context for each opinion. The commissioner reviewed the several doctors' opinions and reasoned:

> [Warren's] right leg deformity resulted in osteoarthritis and further opined that the physical nature of claimant's employment duties materially aggravated and accelerated the osteoarthritis and the need for the right hip replacement. The opinions of both Dr. Miller and Dr. [Munjal] are supported by reference to the work duties of claimant and acknowledge that this is a progression of a preexisting condition. The opinion of Dr. Boulden stands alone in the record. Dr. Boulden's report fails to acknowledge the physical nature of claimant's employment in the rail yard, finding it immaterial. Dr. Boulden merely writes a conclusory statement that claimant's work duties did not accelerate or cause the osteoarthritis of his hip, for which claimant had the hip replacement. Following consideration of the medical opinions of the three medical experts it is concluded that a preponderance of *the evidence supports a conclusion that claimant's right hip osteoarthritis was materially and substantially aggravated by claimant's job duties for defendant, requiring a total right hip replacement*. Claimant has therefore met his burden to prove that his right hip replacement and disability arose out of and in the course of his employment duties with defendant. It is further concluded that claimant has sustained a 20 percent impairment to the whole person along with the restrictions ordered by Dr. Miller.

(Emphasis added.)

In an effort to acknowledge ADM's arguments on judicial review about the differing opinions offered by Dr. Munjal, the district court looked at the record

without Dr. Munjal's opinions to determine whether there was substantial evidence of causation nonetheless. This is not a situation like *McDowell*, a case upon which ADM relied in oral arguments, but had not cited in its briefs.

*McDowell* involved an appeal where our supreme court was concerned that the commissioner had not considered all the evidence. *See McDowell*, 241 N.W.2d at 909. The *McDowell* court wrote,

> Obviously an administrative agency cannot in its decision set out verbatim all the testimony in a case. Obviously also, if the agency quotes some testimony, a losing party should not be able, ipso facto, to urge successfully that the agency did not weigh all the other evidence. *But under the particular record before us we are concerned that the commissioner may well have overlooked Dr. Caulkins' answers to the written interrogatories. The commissioner set out Dr. Caulkins' weaker original testimony—and then referred to this, if we understand the decision correctly, as Dr. Caulkins' strongest testimony. Any reference to Dr. Caulkins' later, stronger answers is conspicuously absent.* The record indicates to us that the commissioner may well have been unaware of those interrogatories and answers. This unawareness may have resulted from claimant's filing the interrogatories and answers after the first hearing had concluded.

241 N.W.2d at 908. The supreme court held, "The proper disposition, however, was not for the [district] court to find the facts but rather to return the case to the commissioner for decision on the record already made." *Id.* at 909. The court concluded:

> We thus remand the case to the commissioner to weigh and consider Dr. Caulkins' answers to the written interrogatories, if the commissioner did not so weigh and consider them originally, and to render a supplemental decision. If the commissioner did weigh and consider those answers originally, he should so recite in his supplemental decision, and his original finding on causation and judgment will stand.

*Id.*

Unlike *McDowell*, the commissioner here referenced, quoted, and cited all of the opinions of all three doctors, then weighed the opinions, giving little weight to Dr. Boulden, recognizing the contradictory opinions of Dr. Munjal, and crediting Dr. Miller's opinions. Contrary to ADM's attempt to characterize the district court's ruling otherwise, the district court did not reweigh the evidence here. Rather, it determined there was substantial evidence supporting the commissioner's conclusion of causation—even without considering Dr. Munjal's opinions. *McDowell* does not stand for the proposition that remand to the commissioner is the proper action here.

Our supreme court has repeatedly held that "if plaintiff was diseased and his condition was aggravated, accelerated, worsened or 'lighted up' by the injury so it resulted in the disability found to exist plaintiff was entitled to recover." *Rose v. John Deere Ottumwa Works*, 76 N.W.2d 756, 761 (Iowa 1956). It has approved the standard of "material" aggravation or acceleration. *Second Injury Fund of Iowa v. Nelson*, 544 N.W.2d 258, 263 (Iowa 1995); *Yeager v. Firestone Tire & Rubber Co.*, 112 N.W.2d 299, 302 (Iowa 1961). This is the standard the commissioner applied; we affirm.

The commissioner found Warren had carried his burden to prove his employment with ADM materially aggravated his condition causing the need for hip replacement. This ruling is supported by Dr. Miller's opinion that Warren's "work activity during his ten years at Archer Daniels Midland were significant physical activities that contributed to the progression of osteoarthritis resulting in

the need for a total hip replacement."[3]  Dr. Munjal was uncomfortable offering an opinion about aggravation of a condition but did sign off on a letter from ADM's attorney agreeing with Dr. Boulden that Warren's "symptoms may have been aggravated by his work."  The worsening nature of Warren's condition is documented in his medical records, which repeatedly note the strenuous nature of Warren's work activities.  As the commissioner stated, "The opinion of Dr. Boulden stands alone in the record.  Dr. Boulden's report fails to acknowledge the physical nature of claimant's employment in the rail yard, finding it immaterial."

It is the commissioner, as fact finder, who is responsible for determining the weight to be given expert testimony.  *See Sherman v. Pella Corp.*, 576 N.W.2d 312, 321 (Iowa 1998).  "The commissioner is free to accept or reject an expert's opinion in whole or in part, particularly when relying on a conflicting expert opinion."  *Pease*, 807 N.W.2d at 85.  In their appellate capacity, courts "are not at liberty to accept contradictory opinions of other experts in order to reject the finding of the commissioner."  *Id.*  Because the commissioner weighed the expert opinion evidence thoroughly and documented its finding of causation, and the district court accepted the finding of the commissioner as supported by substantial evidence in the record, we affirm.

*B. Industrial disability.* "Industrial disability is determined by an evaluation of the employee's earning capacity."  *Pease*, 807 N.W.2d at 852; *see also IBP, Inc. v. Al-Gharib*, 604 N.W.2d 621, 632 (Iowa 2000).  "The commissioner may consider a number of factors in determining industrial disability, including

---

[3] Dr. Boulden opined that Warren's "arthritis was the cause of the operation."

functional disability, age, education, qualifications, experience, and the claimant's inability, because of the injury, to engage in employment for which he is fitted." *Pease*, 807 N.W.2d at 852 (citation, internal quotation marks, and alterations omitted).

Here, the commissioner determined:

> Claimant is a 63 year old worker who has performed heavy, physical labor during his vocational history. Claimant has a limited education, having completed only the 9th grade and later obtaining his GED. Claimant has obtained training from a community college in welding, pipe-fitting, and general construction trades. Claimant is not well suited for retraining due to his age and prior educational history. Claimant has sustained a significant physical impairment from his right hip replacement. He walks with an altered gait and may rely upon a cane or other assistance for mobility. Claimant cannot return to any of his prior employment positions. The physical restrictions set forth by Dr. Miller are severe and would preclude a return to any employment within his experience, training, education, or physical capacities. Claimant is on social security disability benefits. A vocational opinion by Barbara Laughlin, M.A., finds that claimant is precluded even from sedentary positions as he can only sit for 30 to 60 minutes at a time per Dr. Miller.
> Having considered the various factors of industrial disability it is concluded that claimant has sustained an injury which permanently disables him from performing work within his experience, training, education, and physical capacities. Therefore, claimant is entitled to an award of permanent total disability benefits.

ADM argues the commissioner's determination is erroneous because Warren "voluntarily retired." ADM points out Warren's testimony in which he agreed that as of October 2010 when he visited his personal physician, he had planned to retire the following March 2011.

Because ADM's challenge to the commissioner's industrial disability determination depends on the application of law to facts, we will not disturb the ruling unless it is "irrational, illogical, or wholly unjustifiable." *See Neal v. Annett*

*Holdings*, *Inc.*, 814 N.W.2d 512, 526 (Iowa 2012). The commissioner considered the relevant factors of functional impairment, age, intelligence, education, qualifications, experience, and the ability to engage in the employment for which Warren was suited. *See id.*; *see also Larson Mfg. Co.*, *Inc. v. Thorson*, 763 N.W.2d 842, 857 (Iowa 2009) (noting "motivation" as a relevant factor in industrial disability inquiry).

In *Second Injury Fund of Iowa v. Nelson*, 544 N.W.2d 258, 265-67 (Iowa 1995), our supreme court discussed age as a factor in the determination of industrial disability. There, the workers' compensation commissioner had determined the worker's "proximity to normal retirement age also affects his industrial disability. Claimant is near the end of the normal work life. Compared to a younger worker with the same injury, claimant has lost less future earning capacity as a result of his injury." *Nelson*, 544 N.W.2d at 265. The supreme court rejected this reasoning:

> Industrial disability measures an injured worker's lost earning capacity. Factors that should be considered include the employee's functional impairment, age, intelligence, education, qualifications, experience, and the ability of the employee to engage in employment for which he is suited. Thus, the focus is not solely on what the worker can and cannot do; the focus is on the ability of the worker to be gainfully employed.
> Even more important for purposes of our discussion here is the concept that industrial disability rests on a comparison of what the injured worker could earn before the injury as compared to what the same person could earn after the injury. Thus, the level of post-injury earnings is important evidence of whether the injury impaired the worker's capacity to earn. However, the commissioner here did not merely consider whether Nelson had the ability to earn the same wages after his shoulder injury as he could earn before his shoulder injury. The commissioner compared what Nelson could earn over his remaining worklife after his injury with what a hypothetical worker with the same characteristics, but younger, could earn. This comparison is irrelevant in determining Nelson's

*lost earning capacity*. A calculation of the number of years of wages lost by Nelson might be helpful in assessing tort damages for *lost earnings*, but that is not the issue in a workers' compensation case.

. . . .

When the industrial commissioner concludes, as he did here, that an older employee's industrial disability is less because the employee has fewer years left to work, what the commissioner is really saying is that the total amount of future lost wages is a factor in setting the degree of industrial disability. The incorrectness of this analysis is illustrated by applying this concept in another factual context. If the total amount of future lost wages affects the amount of industrial disability, then highly paid workers would be entitled to a greater industrial disability rating than workers in lower-paying jobs. This result would occur even though the two workers' capacities to be employed at the same level as they were employed before the injury are the same. This illustration highlights the fact that the comparison made in determining industrial disability is the worker's capacity to earn before and after the injury, not the worker's capacity to earn as compared to other workers.

We agree with Nelson that the commissioner's consideration of Nelson's age as a factor *reducing* his industrial disability because Nelson would suffer less total future wage loss than a younger worker was erroneous. Our conclusion does not mean that age is irrelevant to determining industrial disability. To the extent Nelson's age affects his actual employability, it is appropriately considered. As the industrial commissioner recognized in his decision, Nelson's age would limit the retraining options available to him. Additionally, one of the vocational rehabilitation experts reported that Nelson would "run into the problem of being accepted by [an] employer at age sixty" and "at sixty years old you have to have some other skills that are pretty marketable if you are going to get on with a new employer." There is simply no evidence in the record that Nelson's age would increase his employability and thereby, reduce the level of his industrial disability. Therefore, we hold the commissioner committed reversible error in concluding that Nelson had less industrial disability than he otherwise would have had merely because he was near retirement age.

*Id.* at 265-67 (citations omitted).

We note, too, that ADM's characterization of Warren's retirement as "voluntary" is not without question. We first observe that Warren testified he "wanted to" retire, which is not synonymous with a definite plan to retire. It

certainly does not mean, as ADM contends, that Warren had already retired. Warren also testified the working conditions "started to tear me up." The record also contains evidence that in May 2011 after his hip replacement, Warren was released to return to work with restrictions. He took those restrictions to ADM and was informed his restrictions could not be accommodated. Warren testified, "I pretty much had to take retirement" and he sought Social Security disability "[a]fter I knew that my—my working days was pretty much shot." On our review of the record evidence, we do not find the commissioner's determination as to industrial disability was irrational, illogical, or wholly unjustifiable.

We affirm the district court's decision affirming the Iowa Workers' Compensation Commissioner's award of permanent total disability benefits to Warren.

**AFFIRMED.**